### STATE OF CONNECTICUT *v.* SILAS HARRIS
### (14415)

PETERS, C. J., CALLAHAN, BORDEN, BÈRDON and SANTANIELLO, JS.

Argued June 3—decision released September 7, 1993

*Daniel S. Fabricant,* special public defender, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Patricia A. Swords,* state's attorney, and *Christopher A. Ford,* law student intern, for the appellee (state).

CALLAHAN, J. On appeal, the defendant, Silas Harris, raises the issue of the sufficiency of the evidence to convict him. He also raises two other issues arising from the trial court's rulings during the course of his criminal trial. The defendant was charged in a substitute information with two counts of assault in the first degree in violation of General Statutes (Rev. to 1989)

§ 53a-59 (a) (1) and (3),[1] and one count each of assault in the second degree in violation of General Statutes § 53a-60 (a) (5),[2] rioting at a correctional institution in violation of General Statutes § 53a-179b,[3] and possession of a weapon or dangerous instrument in a correctional institution in violation of General Statutes § 53a-174a.[4] He was found guilty by a jury of assault in the second degree, rioting at a correctional institution, and possession of a weapon or dangerous instrument in a correctional institution. He was also convicted of being a persistent serious felony offender in violation of General Statutes § 53a-40 (b). He was sentenced as a persistent serious felony offender to a term of

[1] General Statutes (Rev. to 1989) § 53a-59 provides in pertinent part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[2] General Statutes § 53a-60 provides in pertinent part: "(a) A person is guilty of assault in the second degree when . . . (5) he is in the custody of the commissioner of correction, confined in any institution or facility of the department of correction, or is a parolee from a correctional institution and with intent to cause physical injury to an employee of the department of correction or an employee or member of the board of parole, he causes physical injury to such employee or member."

[3] "[General Statutes] Sec. 53a-179b. RIOTING AT CORRECTIONAL INSTITUTION: CLASS B FELONY. (a) A person is guilty of rioting at a correctional institution when he incites, instigates, organizes, connives at, causes, aids, abets, assists or takes part in any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations of such institution.
"(b) Rioting at a correctional institution is a class B felony."

[4] "[General Statutes] Sec. 53a-174a. POSSESSION OF WEAPON OR DANGEROUS INSTRUMENT IN CORRECTIONAL INSTITUTION: CLASS B FELONY. (a) A person is guilty of possession of a weapon or dangerous instrument in a correctional institution when, being an inmate of such institution, he knowingly makes, conveys from place to place or has in his possession or under his control any firearm, weapon, dangerous instrument, explosive, or any other substance or thing designed to kill, injure or disable.
"(b) Possession of a weapon or dangerous instrument in a correctional institution is a class B felony."

imprisonment of ten years on the assault count and twenty-five years on the rioting count to run consecutively, and to a term of twenty-five years on the possession of a weapon count to run concurrently, for a total effective sentence of thirty-five years imprisonment. Thereafter, he appealed from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).[5] We affirm the judgment of the trial court.

The transcript of the defendant's trial reveals the following. On April 19, 1990, at approximately 8:30 p.m., a fight broke out in the east mess hall of the Connecticut Correctional Institution at Somers, involving seventy-five to one hundred inmates who had gathered to share a meal in honor of the Islamic religious feast, Ramadan. Thirty-five correction officers responded in an attempt to restore order. During the incident, the defendant injured correction officer Craig Jacobsen with a sharp instrument. Correction officer Barry Grant, who had checked inmates entering the hall against the list of those authorized to attend, testified that he had seen the defendant in the mess hall on the night in question. Correction officer David Serkosky testified that, upon entering the mess hall in response to Grant's call for help, he had noticed the defendant holding a light colored object resembling a toothbrush

[5] General Statutes § 51-199 (b) (3) provides in pertinent part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, *including any persistent offender status,* for which the maximum sentence which may be imposed exceeds twenty years." (Emphasis added.)

Although none of the underlying convictions would have qualified the defendant's case for direct appeal to this court, his conviction of being a persistent serious felony offender subjected his conviction of rioting at a correctional institution and possession of a weapon or dangerous instrument in a correctional institution, both class B felonies, to an enhanced sentence "for the next more serious degree of felony"; General Statutes § 53a-40 (g); namely, a class A felony. Thus, his appeal was properly filed in this court rather than in the Appellate Court.

handle, an object he said inmates often used to fashion weapons. Serkosky, however, failed to mention the toothbrush handle when he gave a written statement a few hours after the incident. He attributed this failure to the fact that when he had made his statement at approximately 1:45 a.m., after returning from having had his wound sutured at the hospital emergency room, he had been distracted and in pain and had wanted to go home.

Jacobsen testified that he had been standing back from the crowd of inmates trying to restore order when he had been attacked by the defendant.[6] Jacobsen stated that he saw a white object come from behind him along the right side of his neck and he had realized he had been cut. He suffered a six inch laceration. After he had been cut, he turned his head and saw the defendant, approximately three feet away, running away from him towards the crowd of inmates, holding what appeared to be a white toothbrush with a razor blade embedded in the handle. Jacobsen stated that he had seen about one half of the defendant's face as he had run off. According to Jacobsen, the entire incident took about six seconds.

Jacobsen had worked at the prison for only about seven months at the time of the incident. Prior to his employment at the prison, he had worked elsewhere as a security guard for eighteen months.

Jacobsen testified that at the time the defendant cut him, the defendant had been wearing a tan shirt and pants and that he had known the defendant from working in D cell block where the defendant was housed.[7]

---

[6] Serkosky, in his statement to the police, however, indicated that he had had to pull Jacobsen out of the crowd.

[7] Officer Daniel Palonis testified that he had seen the defendant wearing a white undershirt just prior to the incident. Palonis searched the defendant's cell at 2:30 a.m. on April 20, and found a stained white undershirt. Because tests on the stains were inconclusive, the court permitted no evi-

Jacobsen had, in fact, had a brief encounter with the defendant earlier that same day. Jacobsen also testified that after returning from the emergency room, he had told Detective Thomas Davoren that his assailant was "Harris" in D-90. Davoren, the officer in charge of the investigation, also testified that Jacobsen had identified the cell as D-90, even though Jacobsen's written statement merely stated that his assailant was "Harris" in D block.

Jacobsen also identified his assailant as the taller and older Harris brother. In fact, the defendant's brother, who also lived in D block, is older than the defendant. Consistent with Jacobsen's description, however, the defendant is four inches taller than his older brother. Jacobsen testified, moreover, that he had always thought that the defendant was the older of the two Harris brothers. Furthermore, Jacobsen picked the defendant's photograph out of an array that also contained a picture of the defendant's brother. Davoren testified that he had decided to apply for a warrant for the defendant's arrest solely on the basis of Jacobsen's identification of the defendant.

At approximately 12:30 a.m. on April 20, an order was issued by Deputy Warden Christopher Dion to transfer the defendant from D block to F block. Prior to the order, Dion had not told anyone about the pending transfer. The defendant's cell was searched and no weapons of any type were found.[8]

dence to be introduced as to what they were. Jacobsen did not notice if the defendant was wearing a white undershirt under his prison uniform at the time of the attack.

[8] Correction officer Andrew LeBlanc testified, however, that he walked by the defendant's cell shortly after 4 p.m. on April 19, 1990, and noticed boxes stacked up, a sheet obstructing the view, and the walls cluttered with pictures. After the fight in the mess hall, the defendant was locked in his cell. When LeBlanc walked by the defendant's cell at around 11 p.m. that night, the boxes were gone and the walls were barren.

# I

The defendant first claims that there was insufficient evidence to support his conviction because the record does not contain proof beyond a reasonable doubt of his identity as Jacobsen's assailant. We disagree.

The standard of review of an insufficiency claim is twofold. " 'We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt.' " *State* v. *Milardo,* 224 Conn. 397, 402–403, 618 A.2d 1347 (1993); *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Weinberg,* 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990).

The jury must find every element of the crime proven beyond a reasonable doubt in order to find the defendant guilty. The basic and inferred facts underlying those conclusions, however, need not be proved beyond a reasonable doubt. *State* v. *Crafts,* 226 Conn. 237, 243–44, 627 A.2d 877 (1993); *State* v. *Milardo,* supra, 403; *State* v. *Castonguay,* 218 Conn. 486, 507, 590 A.2d 901 (1991). " 'If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt.' " *State* v.

*Milardo,* supra; *State* v. *Pinnock,* 220 Conn. 765, 771, 601 A.2d 521 (1992); *State* v. *Grant,* 219 Conn. 596, 604–605, 594 A.2d 459 (1991).

On the basis of the evidence and the inferences reasonably drawn therefrom, the jury could have concluded beyond a reasonable doubt that the defendant was Jacobsen's assailant. Although he only saw one half of the defendant's face for a few seconds, Jacobsen knew the defendant and he was able to identify him by name and cell number. Further, notwithstanding that Jacobsen's written statement indicated only the defendant's cell block, Davoren testified that Jacobsen had identified the defendant's cell number, as well as his cell block, when he had given his statement. Moreover, although Jacobsen mistakenly indicated that the person who had assaulted him was the older of the two Harris brothers, this misconception does not change the fact that Jacobsen recognized which of the Harris brothers was his assailant. He also correctly identified the defendant as the taller of the brothers and picked the defendant's photograph from an array that included a picture of the defendant's brother. Jacobsen's identification was also corroborated by Serkosky's testimony that he had seen the defendant with the same type of weapon in his hand that Jacobsen had observed. Any inconsistencies in Jacobsen's testimony and his credibility were matters properly left to the jury's determination. *State* v. *Somerville,* 214 Conn. 378, 391–92, 572 A.2d 944 (1990).

The defendant contends, however, that the state's evidence did not preclude every reasonable hypothesis consistent with innocence because the evidence permitted the conclusion that the defendant's brother, not the defendant, was Jacobsen's assailant. The defendant argues that because both Harris brothers resided in D block at the time of the incident and both were in the mess hall when Jacobsen was assaulted, it is a

reasonable hypothesis that the defendant was misidentified. Moreover, Jacobsen identified his assailant as the older Harris brother and conceded that there was a family resemblance between the two brothers. We are unpersuaded.

" 'The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .' " *State* v. *Stanley,* 223 Conn. 674, 681, 613 A.2d 788 (1992); *State* v. *Grant,* supra, 604. " '[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. . . .' " *State* v. *Grant,* supra. " 'That the jury might have drawn other possible inferences from these facts is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt. . . .' " Id.

The jury was entitled to credit Jacobsen's direct testimony that the defendant was his assailant. Moreover, Jacobsen's statement that the person who had assaulted him was "Harris" in D-90, his subsequent photographic identification, and Serkosky's testimony that he had seen the defendant with a weapon in his hand during the incident, as had Jacobsen, allowed the jury reasonably to infer that it was the defendant who had assaulted Jacobsen. We conclude that there was sufficient evidence of identification for the jury to have found proven beyond a reasonable doubt that the defendant was Jacobsen's assailant.

## II

The defendant next claims that the trial court improperly denied him access to Jacobsen's personnel file. Without access to the file, the defendant asserts that he was denied his constitutional right to impeachment

information under *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and his constitutional right to confront witnesses against him as guaranteed by the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[9]

Additional facts are necessary to resolve this issue. Prior to trial, the defendant subpoenaed Jacobsen's personnel file from the department of correction. Jacobsen objected to the disclosure of the contents of his personnel file and the attorney for the department of correction indicated that the file should not be released pursuant to General Statutes § 1-20a[10] and attempted to quash the subpoena. Jacobsen maintained that even if the court believed the subpoena was appropriate, it should conduct an in camera inspection of his file before ordering any disclosure. The court ultimately decided to review Jacobsen's personnel file in camera. There-

[9] The sixth amendment to the United States constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

Article first, § 8, of the Connecticut constitution provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[10] General Statutes § 1-20a provides in pertinent part: "(a) Any contract of employment to which the state or a political subdivision of the state is a party shall be deemed to be a public record for the purposes of section 1-19.

"(b) Whenever a public agency receives a request to inspect or copy records contained in any of its employees' personnel or medical files and similar files and the agency reasonably believes that the disclosure of such records would legally constitute an invasion of privacy, the agency shall immediately notify in writing (1) each employee concerned . . . .

"(c) A public agency which has provided notice under subsection (b) of this section shall disclose the records requested unless it receives a written objection from the employee concerned . . . . Upon the filing of an objection as provided in this subsection, the agency shall not disclose the requested records unless ordered to do so by the freedom of information commission . . . ."

In fact, Jacobsen had objected only orally to the release of his personnel file. The attorney for the department of correction noted, however, that Jacobsen had several days to object in writing under § 1-20a.

after, the defendant told the court that he was seeking information related to the incident, job applications, employment reviews, training information, prior bad acts, and anything that might be "an impeachable criminal offense." He requested the court to examine the file for any possible basis for impeachment, including credibility, bias and Jacobsen's observation abilities. After an in camera review, the trial court released to counsel what it determined to be the relevant portions of Jacobsen's personnel file, specifically those portions including references to the incident of April 19, 1990, and Jacobsen's injuries. The court sealed the remainder of the file. In doing so, the court stated that the file contained no other information relevant to the case useful for impeachment or for any other purpose.

The defendant objected to the limited disclosure, claiming that any evidence of reprimands for inappropriate behavior, lack of previous experience in the correction field, discharge from previous employment and training performance would all be relevant to challenge Jacobsen's observation abilities. The court explained to the defendant that it recognized that if information in his file could be used to discredit his testimony, such information must be disclosed despite statutory constraints on disclosure of information contained in personnel files.[11] Despite this understanding, the trial court denied the defendant's motion for additional information from the file. The court further indicated that although there were employee evaluations and a job application in the file, there were no details concerning training or grades.[12]

---

[11] The court never indicated whether it was referring to General Statutes § 1-19 (b) (2) or General Statutes § 1-20a.

[12] The file did contain the relevant dates of Jacobsen's training, but the trial court noted that this information had already been elicited at trial. The defendant also requested any records of substance abuse or psychiatric treatment, but the court indicated that there were none.

The defendant excepted, arguing that his constitutional rights to confront and to cross-examine Jacobsen fully had been impaired. We are not persuaded that any nondisclosure resulted in a violation of the defendant's constitutional rights.

A

The defendant was not denied his constitutional right to impeachment information under *Brady* v. *Maryland,* supra. A due process violation occurs under *Brady* only if the *prosecution* withholds material evidence favorable to a defendant. Id., 87; *State* v. *Bember,* 183 Conn. 394, 404, 439 A.2d 387 (1981).

We have held, however, that if the trial court discovers material exculpatory evidence in the course of an in camera inspection, it has a duty to disclose it to the defense and the defendant has a due process right to its disclosure. *State* v. *Storlazzi,* 191 Conn. 453, 461, 464 A.2d 829 (1983). The defendant was not entitled, however, to an unlimited inspection of Jacobsen's personnel file in the hope of discovering material evidence. Access to confidential records should " 'be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it' . . . and to weigh that value against the interest in confidentiality of the records." (Citation omitted.) Id., 459, quoting *State* v. *Piskorski,* 177 Conn. 677, 737, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *State* v. *John,* 210 Conn. 652, 669, 557 A.2d 93, cert. denied, 439 U.S. 824, 110

S. Ct. 84, 107 L. Ed. 2d 50 (1989); *United States* v. *Bagley,* 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

Our review of Jacobsen's personnel file, viewed in conjunction with the entire trial transcript, fails to convince us that anything in his file left undisclosed by the trial court would have affected his credibility or would have created a reasonable doubt of the defendant's guilt. The trial court, therefore, did not fail to disclose any evidence bearing on Jacobsen's credibility so material as "to undermine confidence in the outcome" of the trial. *United States* v. *Bagley,* supra, 682. Consequently, the court did not abuse its discretion and the defendant's due process rights were not violated.

### B

The defendant also argues that his federal constitutional right to confrontation under the sixth amendment was violated by his denial of access to Jacobsen's personnel file because he was "precluded from inquiring into a critical area of concern [on cross-examination] and thus denied a fair trial."

This argument was expressly rejected in *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). In that case, the defendant argued that the trial court had violated his constitutional right to conduct cross-examination under the confrontation clause by denying him access to children and youth service records concerning the key witness against him. Id., 51. The defendant contended that the records might have contained impeachment material that would have enabled him to conduct a more effective cross-examination. Id., 52.

In rejecting the defendant's constitutional claim, the United States Supreme Court stated that the confrontation clause guarantees " 'an *opportunity* for effec-

tive cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis in original.) Id., 53, quoting *Delaware* v. *Fensterer,* 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). The confrontation clause is implicated only "when there [is] a specific statutory or court-imposed restriction at trial on the scope of questioning." *Pennsylvania* v. *Ritchie,* supra, 54. The right to cross-examine witnesses "does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." Id., 53.

The court stated, however, that due process provided a right to any exculpatory information contained in records that enjoyed a qualified privilege under state statute.[13] The court concluded that, in balancing the privacy interest in records with the due process rights of the defendant, an in camera review of the record by the trial court is necessary. Id., 57–58. The court also stated that the trial court has a duty to disclose any information that is material to the defense of the accused. Id., 58. It expressly rejected a claim that defense counsel must be allowed to examine confidential records to determine what would be material. Id., 59.

We therefore conclude that the defendant's federal constitutional confrontation and due process rights were adequately protected by the in camera inspection of Jacobsen's personnel file by the trial court.

---

[13] The personnel file at issue enjoys a qualified exemption from disclosure under General Statutes § 1-19 (b) (2) or General Statutes § 1-20a. See *State* v. *Esposito,* 192 Conn. 166, 178, 471 A.2d 949 (1984); *State* v. *Leonard,* 31 Conn. App. 178, 198, 623 A.2d 1052 (1993).

## C

The defendant failed to object to the nondisclosure of Jacobsen's personnel file on the basis of the Connecticut constitution. He claims on appeal, however, that he is entitled to prevail on his state constitutional claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In accordance with *Golding*, a defendant may prevail on an unpreserved claim of constitutional error only by meeting four conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40. In the spirit of *Golding*, this court is free to respond to the defendant's claim "by focusing on whichever condition is most relevant in the particular circumstances." Id., 240. We conclude that the defendant's claim founders on the third *Golding* requirement.

The defendant argues in effect that the trial court's compliance with statutory directives and precedent denied him his constitutional right to confrontation under article first, § 8, of the Connecticut constitution. General Statutes § 1-19 (b) (2) protects from disclosure confidential information in personnel files "that may be potentially relevant to a witness' credibility."[14] *State*

[14] General Statutes § 1-19 provides in pertinent part: "(a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency . . . shall be public records and every person shall have the right to inspect such records promptly during regular office or business hours or to receive a copy of such records . . . .

"(b) Nothing in sections . . . 1-19 to 1-19b, inclusive . . . shall be construed to require disclosure of . . . (2) personnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy . . . ."

v. *Leonard,* 31 Conn. App. 178, 198, 623 A.2d 1052 (1993); *State* v. *Januszewski,* 182 Conn. 142, 171, 172–73, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Moore,* 23 Conn. App. 479, 485–86, 581 A.2d 1071 (1990), cert. denied, 217 Conn. 802, 583 A.2d 132 (1991). Although a criminal defendant has a constitutional right to confront and cross-examine his or her accusers, this right is not absolute. *In re Robert H.,* 199 Conn. 693, 705, 509 A.2d 475 (1986). We have recognized that "the trial court must weigh the defendant's need to examine confidential matter for the purpose of discovering impeaching material against the public policy in favor of the confidentiality of private and personal information." *State* v. *Januszewski,* supra, 171–72.

"If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . ." (Internal quotation marks omitted.) *State* v. *Howard,* 221 Conn. 447, 457–58, 604 A.2d 1294 (1992). A criminal defendant does not have "the right to conduct a general 'fishing expedition' " into personnel records. *State* v. *Januszewski,* supra, 172. Where the defendant's right to impeach a state's key witness is involved, an in camera inspection by the trial judge of the witness' personnel file is appropriate.[15] Id.,

---

[15] *State* v. *Januszewski,* 182 Conn. 142, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), involved General Statutes § 1-19 (b) (2). The defendant in this case also raised General Statutes § 1-20a. The trial court did not indicate, however, which statute it relied on in balancing the defendant's right to discover impeaching material with

173–74; *State* v. *Leonard,* supra, 198–99. After an in camera inspection, the trial court must make a determination of whether the information in the witness' file is probative of his or her capacity to relate the truth or to observe, recollect and narrate relevant occurrences. If the court discovers no probative material useful to the defendant, it should deny the defendant's request for disclosure of confidential information and seal the file to preserve it for possible appellate review. *State* v. *Howard,* supra.

In *Januszewski,* we adopted an in camera review procedure for personnel files, but did not do so as a matter of constitutional law. *State* v. *Januszewski,* supra, 173–74. "The defendant does not argue that this claim involves the violation of a constitutional right and, therefore, the burden rests upon him to demonstrate the harmfulness of the error." Id., 174. The Appellate Court, however, subsequently adopted the same procedure in reviewing personnel files in a case in which the defendant claimed a violation of his constitutional right to confront witnesses against him under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. *State* v. *Leonard,* supra, 196–99.

Moreover, this court has determined that an in camera inspection by the trial court of other types of privileged records satisfied the state constitutional confrontation rights of a defendant.[16] See, e.g., *State* v. *Howard,* supra (psychiatric and juvenile court records); *State* v. *Hufford,* 205 Conn. 386, 533 A.2d 866 (1987)

the confidential nature of the files. The state, however, "filed as a statement of alternative grounds that the entire [Freedom of Information Act] and the State Personnel Act exempt the files from disclosure."

[16] Several other states have adopted the in camera procedure established in *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), for other privileged documents. See, e.g., *State ex rel. Romley* v. *Superior Court,* 172 Ariz. 232, 836 P.2d 445 (1992); *People* v. *Foggy,* 121

(psychiatric records); *In re Robert H.,* supra (rape crisis center records); *State* v. *Esposito,* 192 Conn. 166, 471 A.2d 949 (1984) (psychiatric records). Under the circumstances it can hardly be said that a "constitutional violation clearly exists and clearly deprived the defendant of a fair trial." *State* v. *Golding,* supra, 240. Pursuant to the third prong of *Golding,* the defendant cannot prevail on this claim.

We are also unpersuaded by the defendant's argument that article first, § 8, of the Connecticut constitution requires that confidential records be given directly to the defendant's counsel rather than to the trial court for in camera review. We are not convinced that the trial court is unable to detect those materials in confidential records that must be disclosed in order to afford a defendant his state due process and confrontation rights. In *State* v. *Storlazzi,* supra, 461, we rejected a similar claim that the trial court, because of its unfamiliarity with the theory of defense, could not make an in camera determination of whether material was exculpatory. Moreover, the United States Supreme Court in *Pennsylvania* v. *Ritchie,* supra, 60, stated that a defendant's "interest . . . in ensuring a fair trial can be protected fully by requiring that [confidential] files be submitted only to the trial court for in camera review."

---

Ill. 2d 337, 347-50, 521 N.E.2d 86 (1988); *State* v. *Perry,* 552 A.2d 545, 547 (Me. 1989); *State* v. *Cusick,* 219 N.J. Super. 452, 455-63, 530 A.2d 806 (1987); *Gale* v. *State,* 792 P.2d 570, 583 (Wyo. 1990).

Two states have determined that their state constitution requires that counsel be given access to privileged records with appropriate protective orders. See *Commonwealth* v. *Stockhammer,* 409 Mass. 867, 570 N.E.2d 992 (1991); *Commonwealth* v. *Lloyd,* 523 Pa. 427, 567 A.2d 1357 (1989). The Pennsylvania Supreme Court subsequently limited *Lloyd,* holding that access to privileged records by counsel is not required where records enjoy an absolute statutory privilege. *Commonwealth* v. *Wilson,* 529 Pa. 268, 602 A.2d 1290 (1992).

In view of these precedents, the defendant has not demonstrated that the trial court's failure to turn over Jacobsen's file to defense counsel for counsel's perusal constituted a clear state constitutional violation. The defendant therefore cannot prevail on this unpreserved claim under *Golding*.

## III

The defendant finally claims that the trial court abused its discretion by failing to read back to the jury certain portions of Jacobsen's testimony that counsel and the court earlier had agreed would be read. The additional portions were not read because the jury stated to the court that it did not wish to have them read.

Additional facts are necessary to resolve this issue. During deliberations, the jury asked to have read back Jacobsen's testimony concerning what had transpired from the time he had entered the mess hall until his identification of the defendant. The jury indicated that it did not want to rehear Jacobsen's testimony relative to the photographic identification. Prior to reading back the testimony, however, the trial court and counsel agreed that certain portions of Jacobsen's cross-examination, redirect examination and recross-examination, including testimony relative to the identification process, and Jacobsen's presence in the crowd of inmates, would also be read back. When the court reporter began reading portions of Jacobsen's cross-examination as agreed upon by the court and counsel, however, the jury foreperson indicated that the reporter should stop. In response to the court's inquiry if they would like to hear more, the jurors answered in the negative and were excused from the courtroom.

The defendant requested that the other agreed upon portions of the testimony be read to the jury. The court denied the request and the defendant excepted. The

court had the jury returned to the courtroom and stated: "[J]ust so the record is clear . . . the foreperson indicated they have heard sufficient testimony read back to them. There is additional cross-examination and additional redirect and additional recross. It was indicated by the foreperson that this was not necessary to be read back. Does any juror want any further portion of that testimony read back?" The jurors unanimously indicated that they did not wish to rehear any further testimony.

The defendant renewed his exception and requested that the agreed upon portions of Jacobsen's testimony that had not been read to the jury be marked as an exhibit for identification in order to preserve the record for appeal. The court indicated that if the court reporter prepared a transcript indicating the portions of testimony the court and counsel agreed to have read back, it would be marked as an exhibit. Such a transcript, however, was never prepared.[17]

The trial court has discretion to grant a jury's request to review testimony.[18] Practice Book § 863; *State* v. *Rivera,* 223 Conn. 41, 48, 612 A.2d 749 (1992). " 'What

[17] In a letter to defense counsel after the trial, however, the court reporter did indicate the portions of testimony that were reread. The record indicates that the defendant was not at fault for the failure of the record to be adequately preserved. It is true that, as the state points out, the letter of the court reporter is not properly part of the trial record. Although ordinarily we do not take cognizance of extra-record factual matters in order to fill gaps in the record, in this limited instance we will assume that the letter accurately describes the portions of the transcript that had been reread because (1) the defendant was not responsible for the failure to preserve the record, and (2) even if it is assumed that the letter is accurate, the defendant's claim fails. We will assume, therefore, that the defendant's claim has been properly preserved for appeal.

[18] Practice Book § 863 provides: "If the jury after retiring for deliberations request a review of certain testimony, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the judicial authority, after notice to the prosecuting authority and counsel for the defense, shall have the requested parts of the testimony read to the jury."

portions of the record, if any, will be submitted to the jury for their consideration is a matter of sound judicial discretion.' '' *State* v. *Bennett,* 171 Conn. 47, 59, 368 A.2d 184 (1976). The defendant contends that the trial court abused its discretion by failing to require the jury to hear certain portions of the testimony that it specifically stated it did not want to hear. We disagree.

*State* v. *Rivera,* supra, is dispositive of this issue. See also *State* v. *Nowakowski,* 188 Conn. 620, 452 A.2d 938 (1982). In *Rivera,* the jury asked to rehear two witnesses' testimony and then stated that it had heard enough after hearing the direct examination of one witness. The defendant objected, claiming that the jury should also be required to hear that witness' cross-examination. In determining that the court did not abuse its discretion by not requiring the jury to hear more testimony than it wished to, this court stated: "We conclude, however, that the trial court acted within its discretion when it allowed the jury to rehear only that testimony that the jury indicated that it wished to rehear. We cannot conclude, as the defendant seems to advocate, that the trial court was required as a matter of law to replay more of the witnesses' testimony than the jury believed it needed to rehear in order to reach a verdict." *State* v. *Rivera,* supra, 48.

The fact that prior to the commencement of the read back there was an agreement between the court and counsel to have read back certain unrequested portions of the record did not limit the trial court's discretion. Because the jury asked that the reading of the testimony stop and declined an invitation to hear anything further, the trial court did not abuse its discretion when it halted the reading of the testimony. Unless the court was convinced that an injustice would result, it was not, despite any agreement, required to force the jury to listen to what it did not want to hear. The prior agree-

ment postulated that the reading of the unrequested testimony would have some purpose. The jury's request, however, that the reading be stopped and its decline of an invitation to hear anything further clearly indicated that the evidence was now firmly fixed in its collective mind and that no further refreshing of its memory was necessary for it to arrive at a verdict. The agreement was not a contract that compelled the trial court to comply with its terms if compliance would interfere with its proper conduct of the trial.

The defendant's final claim is without merit.

The judgment is affirmed.

In this opinion PETERS, C. J., and SANTANIELLO, J., concurred.

BORDEN, J., concurring. I agree with both the reasoning and the results of parts I, II A and B, and III of the majority opinion. With respect to part II C, however, I concur in the result only, because I disagree with the majority's method of analysis under the third prong of *State* v. *Golding,* 213 Conn. 233, 240, 567 A.2d 823 (1989), namely, that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial."

The majority's reasoning under the third prong of *Golding* is that, so long as there are valid analogous precedents that could have been followed by the trial court had the constitutional claim been made in the trial court, the defendant cannot prevail on appeal because it cannot be said that there was a "clear" constitutional violation. Thus, under this reasoning, even if, after a plenary analysis, we might conclude that there had been a violation of the defendant's constitutional rights, because that result is not clearly apparent without such a plenary analysis, the defendant may not prevail under the third prong of *Golding*.

Despite the language in *Golding* that would support such an analysis, neither this court nor the Appellate Court has consistently read *Golding* so narrowly. Instead, in utilizing the third prong of *Golding*, we have ordinarily—and appropriately, in my view—simply addressed the constitutional claim and decided it on its merits. This is not the case, however, for a resolution of the precise meaning and scope of *Golding*, because the result would be the same under the majority's and my reading of *Golding*, namely, that article first, § 8, of the Connecticut constitution does not require that confidential records be given directly to the defendant's counsel rather than to the trial court for in camera review. See, e.g., *State* v. *Howard,* 221 Conn. 447, 456–58, 604 A.2d 1294 (1992).

BERDON, J., dissenting. The defendant argues that the trial court's refusal to grant his counsel unlimited access to correction officer Craig Jacobsen's personnel file violated his right to confrontation as guaranteed by article first, § 8, of the Connecticut constitution.[1] Despite the importance of this issue, the majority refuses to review it, holding that the defendant has failed to meet the third prong of *State* v. *Golding,* 213 Conn. 233, 240, 567 A.2d 823 (1989), which requires that the defendant show that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial. In arriving at this conclusion, the majority rejects the state constitutional issue without any analysis. See *State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). I disagree because I believe that there has been a clear violation of the state constitution.

The defendant's independent analysis under the state constitution leads me to the conclusion that our confrontation clause requires that defense counsel be

---

[1] See footnote 9 of the majority opinion.

allowed full access to records clothed with a statutory privilege. In this case, Jacobsen's personnel records are protected by a qualified statutory privilege. General Statutes § 1-19.[2]

The majority relies on the United States Supreme Court case of *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 59–60, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987),[3] in which four justices held that the federal confrontation clause does not give defense counsel a right to examine the full contents of privileged records and that the defendant's right to a fair trial can be fully protected by the trial court's in camera review of the records. For the purposes of this dissent, I take this to be federal law even though the decision is not necessarily supported by a majority of the court.

When construing our state constitution, we are not bound by the United States Supreme Court's interpretation of the requirements of the federal confrontation clause. " '[W]e may find greater protection of individual rights under our state constitution than that provided by the federal constitution. "It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . ." (Internal quotation marks omitted.) *State* v. *Oquendo*, [223 Conn. 635, 649, 613 A.2d 1300 (1992)]. Moreover, we have held that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last

[2] General Statutes § 1-19 (b) (2) exempts from disclosure "personnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy."

[3] Four justices dissented in *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987), on the ground that the court lacked jurisdiction to decide the issue because it was not a final judgment.

resort . . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . ." *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990). Recognizing that our state constitution "is an instrument of progress [and] is intended to stand for a great length of time and should not be interpreted too narrowly or too literally" . . . *State* v. *Oquendo,* supra, 649; we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution. . . .' " *State* v. *Miller,* 227 Conn. 363, 379–80, 630 A.2d 1315 (1993).

Article first, § 8, of the state constitution, which contains the state confrontation clause, guarantees the accused the right "to be confronted by the witnesses against him."[4] This guarantee is "stated in absolute and unconditional terms." *State* v. *Torello,* 103 Conn. 511, 513, 131 A. 429 (1925). The confrontation clause serves "to mark, preserve, protect and perpetuate a right existing under the common law. It did not establish a new principle in criminal procedure; it merely secured an old principle whose earlier violation in England in political prosecutions had led to the incorporation of a similar provision in every State constitution up to this time. The common-law right to which this and like sections in the constitutions of the other States referred to, was the right of cross-examination. The fundamental purpose in securing this right, 'to be confronted by the witnesses against him,' was to give to the accused the right of opportunity to cross-examine

---

[4] See footnote 9 of the majority opinion.

the witnesses against him . . . ." Id. Indeed, Chief Justice Swift pointed out that on cross-examination "[t]he parties are to be permitted to put such questions as are calculated to draw out the truth according to the character, and conduct of witnesses." Z. Swift, Digest of the Law of Evidence (1810) p. 110; see also 1 Z. Swift, Digest of the Laws of the State of Connecticut (1822) p. 748.

We have long held that "[w]hen a conviction depends entirely upon the testimony of certain witnesses, as it did in the present case, information affecting their credibility is material in the constitutional sense since if they are not believed a reasonable doubt of guilt would be created." *State* v. *Grasso,* 172 Conn. 298, 302, 374 A.2d 239 (1977). "[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case." *Pointer* v. *Texas,* 380 U.S. 400, 404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

It is clear that the common law shaped our state constitution and has long been recognized as a means for determining what the framers of the constitution had in mind. "State courts . . . must be empowered to determine, in light of state interests and *state history,* what meaning to attribute to provisions contained in state constitutions." (Emphasis added.) E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 588 (1986). In *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988), this court held that we may look to "the historical record and due process tradition" in Connecticut to determine whether article first, § 8, of the Connecticut constitution affords greater rights than its federal counterpart. "Indeed, Chief Justice Peters has noted that '[i]n Connecticut constitutional law, it is well established that several rights now denominated as constitu-

tional had well-recognized common law antecedents.' E. Peters, 'Common Law Antecedents of Constitutional Law in Connecticut,' 53 Alb. L. Rev. 259, 261 (1989). In addition, Chief Justice Peters has recognized that 'we should cast a wider net to discover the variety of ways in which substantive rights were protected in state courts in the early years.' Id." *State* v. *Joyner,* 225 Conn. 450, 489, 625 A.2d 791 (1993) (*Berdon, J.,* dissenting).

Not only does the Connecticut confrontation clause protect the accused's right to cross-examination, but it prevents the state from interfering with the right to effective cross-examination. "The creation of a significant impediment to the conduct of cross-examination thus undercuts the protections of the Confrontation Clause, even if that impediment is not erected at the trial itself." *Pennsylvania* v. *Ritchie,* supra, 71 (Brennan, J., dissenting). By placing the personnel files out of defense counsel's reach, the defendant's right of confrontation is violated because it undercuts effective cross-examination.

The trial court's in camera scrutiny of the privileged records in place of defense counsel's scrutiny simply does not satisfy this constitutional right. The trial judge is not an adequate substitute for the trial advocate because the trial judge is not in a position to sort out the type of information that could be relevant in effective cross-examination. It is "extremely difficult for even the most able and experienced trial judge under the pressures of conducting a trial to pick out all of the [evidence] that would be useful in impeaching a witness. . . . Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the

defense can properly and effectively be made only by an advocate." (Citation omitted; internal quotation marks omitted.) *Dennis* v. *United States,* 384 U.S. 855, 874–75, 86 S. Ct. 1840, 16 L. Ed. 2d 973 (1966). Indeed, in *Ritchie,* the court admits that the "eye of the advocate" is beneficial to the defendant in ferreting out information. *Pennsylvania* v. *Ritchie,* supra, 59. The majority's claim that the trial court is in a better position to assess the probative value of material in the file and to weigh its value against the confidentiality of the record is simply untenable. It is no less repugnant to our jurisprudence to allow the trial court to decide such matters in a vacuum than it is to allow the trial court to decide matters ex parte.

Nor could the infringement on the right of confrontation be constitutionally compensated by granting the defendant wider latitude at trial to question witnesses. Effective cross-examination to impeach a witness requires knowledge. No lawyer worth his or her salt will delve into an area of cross-examination without first being able to see what is at the end of the tunnel. When there is evidence that could impeach the credibility of a witness, it must be made available to defense counsel. When a lawyer seeks this information about crucial state witnesses, it cannot be passed off as a "fishing expedition" by the defendant. When the defendant's liberty is at stake, he has a right to know about all evidence that may be relevant for cross-examination of the witness.

An individual's privacy is important, but the constitutional right to confrontation, including the right to effective cross-examination of the witness, is essential. Moreover, both competing rights can be easily accommodated. Noting the trial court's broad discretion to control courtroom proceedings, the Massachusetts Supreme Court suggested that "[t]here is no reason why [the court] cannot take steps to insure that

breaches of confidentiality attending discovery are limited only to those absolutely and unavoidably necessary to the preparation and presentation of the defendant's defense. For example, judges could allow counsel access to privileged records only in their capacity as officers of the court. Admission of or reference to any such information at trial could be conditioned on a determination (made after an in camera hearing) that the information counsel seeks to use is not available from any other source. . . . Protective orders (enforced by the threat of sanctions) requiring counsel and other necessary participants in the trial not to disclose such information could be entered. . . . Although these procedures would result in counsel for the defendant and the [state], rather than just the judge, viewing privileged records, if careful precautions in the order of those described above are taken, such breaches of confidentiality need not be any more intrusive or harmful than those attending in camera review of records by the judge alone." (Citations omitted.) *Commonwealth* v. *Stockhammer,* 409 Mass. 867, 882–83, 570 N.E.2d 992 (1991); see also *Zaal* v. *State,* 326 Md. 54, 87, 602 A.2d 1247 (1992) (giving trial court discretion to review records alone, to review in the presence of counsel, or to permit review by counsel alone, as officers of the court, subject to restrictions to protect confidentiality); *Commonwealth* v. *Lloyd,* 523 Pa. 427, 567 A.2d 1357 (1989) (state constitutional right to confrontation violated when defense counsel was denied total access to victim's psychotherapeutic records).

I would adopt a rule that permits defense counsel to inspect confidential records under strict orders from the trial court that counsel not disclose any material, other than that permitted by the trial court following an in camera hearing attended by both the state's attorney and defense counsel. Accordingly, in this case the trial court should have allowed defense counsel to

inspect Jacobsen's file. I would therefore remand the case to the trial court with direction to permit defense counsel to inspect the file. If defense counsel's inspection reveals evidence he considers to be exculpatory or information which could lead to such evidence, I would order the trial court to hold an in camera hearing, attended by both the state's attorney and defense counsel. After the hearing, the trial court may exercise its discretion to order a new trial if necessary.

I respectfully dissent.