## STATE OF CONNECTICUT *v.* GEORGE FIGUEROA
### (AC 22646)

Lavery, C. J., and Dranginis and Dupont, Js.

Argued September 19—officially released December 17, 2002

*Richard E. Condon, Jr.*, assistant public defender, for the appellant (defendant).

*Thomas M. DeLillo*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, George Figueroa, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35. He was sentenced to a total effective term of sixty years incarceration. On appeal, the defendant claims that the trial court improperly directed the jury to two pages of a witness' twenty-one page statement in response to a question by the jury during its deliberations. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the summer of 1995, the defendant and the victim, John Corbett, were involved in a physical altercation on Lilac Street in New Haven. During that altercation, Corbett hit the defendant in the face. Thereafter, the defendant retreated to his then residence at 40-42

Lilac Street, retrieved his gun and, from a window of his third floor apartment, began firing at Corbett, who was standing in the street. Corbett was not injured during that incident, which never was reported to the police.

Shortly thereafter, Corbett was incarcerated. He was released from prison sometime in November, 1997. Approximately two weeks later, on December 7, 1997, at about 2:30 p.m., Corbett was standing at the corner of Lilac and Newhall Streets, speaking with Edward Wells. After speaking with Wells for about twenty minutes, Corbett left the area but returned a short time later and resumed his conversation with Wells. The two men were standing in front of 44-46 Lilac Street when the defendant approached, driving his white 1997 Toyota Camry, which he parked in front of a red sports car that also was parked along the side of Lilac Street. The defendant got out of his car and entered the house at 40-42 Lilac Street, where his brother resided.[1]

In the meantime, Ebonie Moore approached, driving her black Laser, which she parked along Lilac Street in back of the red sports car that was parked there. She and her passenger, Takheema Williams, who had dated the defendant, were sitting in Moore's car listening to music.

Thereafter, the defendant emerged from the 40-42 Lilac Street residence and stood near his car. It was at that time that Corbett told Wells that he wanted to speak with the defendant.[2] Corbett walked to where the defendant was standing. The two talked for a short time, they shook hands and then a shot was fired. As

---

[1] It does not appear that the defendant and the occupant of the apartment at 40-42 Lilac Street were actually blood relatives, but the two grew up together and referred to each other as brothers.

[2] According to Williams' tape-recorded statement to the police, Corbett "wanted to ice the beef" with the defendant, meaning he wanted to put an end to any remaining animosity between the two.

Corbett turned away from the defendant, he fell face down onto the sidewalk. Wells and Moore then watched as the defendant stood over Corbett, with his arm fully extended and a pistol in his hand, and fired several additional shots into Corbett's body. The defendant then walked to his white Toyota Camry, which was parked a few feet away, got into the driver's seat and sped along Lilac Street toward Newhall Street.

Wells then ran to Moore's parked car, banged on the window and yelled for Moore to call for an ambulance because, in his words, "George [the defendant] had just shot John." Moore and Williams exited the vehicle. Moore attempted to call for an ambulance on her cellular telephone. She and Wells then administered cardiopulmonary resuscitation to Corbett until the police arrived. Williams walked away from the scene. Shortly thereafter, an ambulance arrived and transported Corbett to Yale-New Haven Hospital where he was pronounced dead about eight minutes after his arrival. Corbett suffered six gunshot wounds. He was shot once in the stomach, four times in the lower back and once in the back of his left shoulder. Either or both of two of the wounds to Corbett's lower back were fatal.

Soon thereafter, Wells and Moore arrived at the hospital where they told a New Haven police detective that it was the defendant who had shot Corbett. Within the next few days, both Wells and Moore gave statements to the police implicating the defendant as the shooter and selected the defendant's photograph from a photographic array, identifying him as the man who shot Corbett. On December 10, 1997, Williams gave the police a tape-recorded statement regarding the December 7, 1997 shooting on Lilac Street.

At trial, the defendant testified that he could not have shot Corbett because he was living in New York at the time. Both Wells and Moore testified, however, that

they saw the defendant shoot Corbett. Williams also testified, but her testimony was inconsistent with the tape-recorded statement that she had given to the police on December 10, 1997, just three days after the shooting.[3] Accordingly, her taped statement and a twenty-one page transcript of that tape were admitted into evidence as full exhibits for substantive and impeachment purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[4]

On April 27, 2000, during the fifth day of jury deliberations, the jury submitted the following question to the court: "We would like to hear if Takheema Williams was ever asked and answered the question: '[D]id you see [the defendant] at the scene?' " Outside the presence of the jury, in discussing the jury's question with counsel, the court indicated that it could not find a definitive answer to that question in its notes.

Consequently, the court determined that the only way to answer the jury's question accurately was to listen to the testimony. The court and counsel then listened to Williams' in-court testimony. After doing so, the court stated that "the literal answer is no, she was never asked that question." The court went on to state, however, that Williams' *Whelan* statement had been admitted for substantive and impeachment purposes, and that on pages eighteen and twenty of the transcript of that statement, she did testify as to what she saw. The court

---

[3] Essentially, Williams testified that she could not recall any of what happened on December 7, 1997, or what she had told the police on December 10, 1997.

[4] "A prior inconsistent statement may be used at trial for substantive as well as impeachment purposes where the statement is signed by a declarant, who has personal knowledge of the facts stated therein, and who testifies at trial and is subject to cross-examination." *State* v. *Hunter*, 62 Conn. App. 767, 770 n.5, 772 A.2d 709, cert. denied, 256 Conn. 925, 776 A.2d 1144 (2001), citing *State* v. *Whelan*, supra, 200 Conn. 753.

then heard comment from counsel on its proposal to direct the jury to those particular pages of Williams' *Whelan* statement. Counsel for the state supported the court's proposal. Defense counsel did not. He argued that the court should instruct the jury only that the answer to its question is "no," but that it could consider Williams' entire *Whelan* statement as substantive evidence. Defense counsel specifically objected to the court's "highlighting" the portions of the statement that the court and the state believed answered the jury's question because defense counsel believed "that would be, in a sense, marshaling the evidence."

Thereafter, the court had the jury brought back to the courtroom where it explained to the jury that "[c]ounsel and I have reviewed the taped testimony of the witness, Takheema Williams, presented to you here in court, and the answer to your question: '[W]as she asked, [D]id you see [the defendant] at the scene?' is no. She was not asked during her testimony here in court." The court then went on to remind the jury that Williams' prior tape-recorded statement and the transcript of that statement were in evidence. The court referred the jury to its written copy of the court's instructions regarding the use of the *Whelan* statement. It then directed the jury to the tape-recorded statement and to pages eighteen and twenty of the transcript of Williams' *Whelan* statement, stating: "[B]ut again, it's up to you as to what weight you accord to any evidence. I just want to remind you of that." Four days later, on May 1, 2000, the jury returned a verdict of guilty as to both counts. Additional facts will be set forth as necessary.

## I

The defendant claims that the court improperly referred the jury to two pages of Williams' twenty-one page *Whelan* statement in responding to the jury's question as to whether she had ever said that she saw the

defendant at the crime scene. The defendant proffers two arguments in support of his claim. He argues that the court's response to the jury's inquiry was improper and violated his right to a fair trial because (1) the court had authority to refer the jury to Williams' in-court testimony only and lacked authority to direct the jury to Williams' *Whelan* statement, and (2) referring to only two pages of the twenty-one page *Whelan* statement constituted an improper marshaling of the evidence by the court in favor of the state. We address each of those arguments in turn.

A

The defendant first claims that the court acted beyond the scope of the authority accorded to it pursuant to Practice Book § 42-26 when it referred the jury to Williams' *Whelan* statement in response to the jury's question as to whether Williams ever had been asked to answer the question: "[D]id you see [the defendant] at the scene?" which violated his right to a fair trial. Specifically, he claims that because Practice Book § 42-26 authorizes the court only to respond to jury requests for a review of in-court testimony, the court acted without authority and in violation of his fundamental right to a fair trial in referring the jury to Williams' *Whelan* statement.

The defendant concedes that he did not preserve his claim at trial. Accordingly, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or, in the alternative, under the plain error doctrine. Practice Book § 60-5. Because we conclude that the record is adequate for review and that the claim is of constitutional magnitude alleging the violation of a fundamental right; see *State* v. *Smith*, 35 Conn. App. 51, 66, 644 A.2d 923 (1994); we will review the claim. We conclude, however, that the court neither violated Practice Book § 42-26 nor deprived the defendant of

his right to a fair trial by directing the jury to Williams' *Whelan* statement. The defendant, therefore, fails to satisfy the third prong of *Golding. State* v. *Golding*, supra, 240. Furthermore, we are not persuaded that the court's reference to Williams' *Whelan* statement adversely affected the fairness and integrity of the proceedings such that it constituted plain error.

As the defendant correctly points out, the plain language of Practice Book § 42-26 refers only to reading requested portions of in-court testimony to the jury. Our Supreme Court has not, however, interpreted Practice Book § 42-26 that narrowly. See *State* v. *Gould*, 241 Conn. 1, 11–14, 695 A.2d 1022 (1997). Practice Book § 42-26 provides: "If the jury after retiring for deliberations request a review of certain testimony, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the judicial authority, after notice to and consultation with the prosecuting authority and counsel for the defense, shall have the requested parts of the testimony read to the jury." The court's determinations about "[w]hat portions of the record, if any, will be submitted to the jury for [its] consideration is a matter of sound judicial discretion." (Internal quotation marks omitted.) *State* v. *Conde*, 67 Conn. App. 474, 499, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

In *State* v. *Gould*, supra, 241 Conn. 9, the defendants argued that the court violated Practice Book § 863, now § 42-26, when it granted the jury's request to view the out-of-court videotaped testimony of a particular witness in the jury room during deliberations. The defendants in *Gould* argued, as does the defendant in this case, that in granting the jury's request, the court violated Practice Book § 863, now § 42-26, which our Supreme Court stated *"generally* provides for the rereading of testimony in open court under circumstances . . . in which the court reporter must read

back trial testimony from stenographic notes or locate and play back a recorded voice tape of such testimony on a tape player." (Emphasis added.) *State* v. *Gould,* supra, 12. In concluding that the court did not abuse its discretion by allowing the jurors to view prerecorded videotaped testimony, the court reasoned that "[i]f jurors are to decide cases, as their oaths require them to, according to the evidence before them, or according to the evidence given them in court, why should they not, when they have forgotten *a material part of the evidence,* be permitted to make use of an available and generally most reliable means of recalling it? It is the policy of the law that every tribunal for the trial of civil or criminal causes should have open to it the best legitimate means of acquiring such knowledge of the law and the facts as will enable it to decide the cases before it fairly and intelligently." (Emphasis added; internal quotation marks omitted.) Id., 12–13.[5]

We note that in the present case, the jury's inquiry was not limited to testimony. The jury requested to know whether Williams "was *ever* asked to answer the question, '[D]id you see [the defendant] at the scene?' " (Emphasis added.) Furthermore, because Williams never answered that question during her in-court testimony, the most reliable means for the jury fairly and intelligently to ascertain whether she ever had been asked and had answered that question was for the court to refer the jury to a material part of the evidence, namely, Williams' *Whelan* statement, which already was in the jury's possession. Accordingly, we conclude that directing the jury to Williams' *Whelan* statement in response to the jury's inquiry as to whether she ever

---

[5] On the basis of that reasoning, our Supreme Court also has "concluded that the trial court was not 'without authority' to furnish the jury with a typewritten transcript of the testimony it had requested, which the jury could use in the jury room as it saw fit." *State* v. *Gould,* supra, 241 Conn. 13, quoting *State* v. *Rubaka,* 82 Conn. 59, 66, 72 A. 566 (1909).

was asked if she saw the defendant at the crime scene was not outside the scope of the court's authority. We conclude that it was a matter entirely within the court's discretion and that the court did not abuse its discretion in so doing.

Moreover, Practice Book § 1-8 provides for a liberal interpretation of our rules of practice.[6] "Procedural rules are not ends in themselves but only the means of administering justice, and exceptions to them in specific cases may be allowed where no violation of constitutional rights is involved. From time to time the court is confronted with exceptional situations that may not be specifically covered by a specific rule. In the interests of justice, however, it has the inherent power to issue an order that meets the problem if it is satisfied no violation of substantial rights will result." *State* v. *Anonymous (1976-2)*, 32 Conn. Sup. 306, 312–13, 353 A.2d 789 (1976); see also *State* v. *Dupree*, 56 Conn. App. 631, 645 n.15, 745 A.2d 832, cert. denied, 252 Conn. 952, 749 A.2d 1203 (2000).

In this case, the claimed impropriety was a matter within the court's discretion. We conclude that the court acted in furtherance of the interests of justice by referring the jury to Williams' *Whelan* statement because, if it had not done so, the court would not have been completely responsive to the jury's request. In addition, we fail to see how the court violated the defendant's constitutional right to a fair trial by referring the jury to Williams' *Whelan* statement because it already had been admitted for substantive purposes and was in the jury's possession during its deliberations. Accordingly, the defendant cannot prevail on his claim because he has failed to demonstrate that "the alleged constitu-

---

[6] Practice Book § 1-8 provides: "The design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice."

tional violation clearly exists and clearly deprived [him] of a fair trial" pursuant to the third prong of *State* v. *Golding*, supra, 213 Conn. 240.

Likewise, the defendant cannot prevail under the plain error doctrine. "[P]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . The claimed error here is not so egregious or obvious as to merit such review." (Internal quotation marks omitted.) *State* v. *Beverly*, 72 Conn. App. 91, 104–105, 805 A.2d 95, cert. denied, 262 Conn. 910, 810 A.2d 275 (2002).

## B

The defendant next claims that the court unfairly and prejudicially marshaled the evidence in favor of the state in violation of his constitutional right to a fair trial when, in response to the jury's question, the court referred the jury to two particular pages of Williams' *Whelan* statement rather than to the entire twenty-one page statement. Specifically, he claims that the court improperly assumed a position of advocacy in favor of the state when it directed the jury to pages eighteen[7] and twenty[8] of the statement, which seemed to indicate

[7] Page eighteen of Williams' *Whelan* statement reveals that the following colloquy took place between Williams and Detective Edwin Rodriguez of the New Haven police department:

"Q. Okay, when was the last time you seen [the defendant]?

"A. Two days before.

"Q. The shooting?

"A. Yes.

"Q. And you saw him the day when he took off in the car, too?

"A. Mm. Hm."

[8] Page twenty of the *Whelan* statement reveals the following colloquy between Williams and Detective Edwin Rodriguez of the New Haven police department:

"Q. "You stated to me that Ebonie [Moore] told you something after everything was done. What did she tell you again, can you tell . . . ?

"A. You seen that, you seen that, you know who did it.

"Q. And she meant saying that if you saw the same thing she did?

that Williams had witnessed the defendant at the crime scene, thereby highlighting the state's position, while at the same time the court failed to direct the jury to page eleven of the statement, which seemed to indicate that Williams had not witnessed the defendant at the scene. That claim is without merit.

The court's reference to particular pages of the *Whelan* statement in an effort to answer the jury's inquiry did not constitute a marshaling of evidence in favor of the state but, instead, a simple response to the jury's request for a review of a portion of the record under Practice Book § 42-26. See, e.g., *State* v. *Harris*, 227 Conn. 751, 769–72, 631 A.2d 309 (1993); *State* v. *Rivera*, 223 Conn. 41, 47–48, 612 A.2d 749 (1992). As previously stated: "[T]he trial court has discretion to determine what portions of the record, if any, should be submitted to the jury for its review." *State* v. *Gould*, supra, 241 Conn. 11. "In reviewing whether the trial court abused its discretion, the issue is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted reasonably. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action." (Citations omitted; internal quotation marks omitted.) *State* v. *Riddick*, 61 Conn. App. 275, 282, 763 A.2d 1062, cert. denied, 255 Conn. 946, 769 A.2d 61 (2001).

In making every reasonable presumption in favor of the court's action, as we must, we cannot say that the court abused its discretion in referring the jury to pages eighteen and twenty of Williams' *Whelan* statement

"A. Yeah.
"Q. And you told her no at the time, is that correct?
"A. No, I didn't.
"Q. What did you tell her?
"A. I told her, yeah.
"Q. Okay, you told her you saw the same thing she saw?
"A. Mm. Hm."

rather than to the entire statement. It was in the court's discretion to determine that those particular pages, and not the entire twenty-one page statement, were responsive to the jury's request. See *State* v. *Harris*, supra, 227 Conn. 769–72; *State* v. *Rivera*, supra, 223 Conn. 47–48. Furthermore, we disagree with the defendant's characterization of the question that was asked of Williams on page eleven of her *Whelan* statement. As we read page eleven of Williams' *Whelan* statement, she was not asked to answer whether she saw the defendant at the crime scene. Williams, instead, was asked to answer the question: "[D]id you see [the defendant] *in the car*?" (Emphasis added.) Her response to that question was: "I couldn't, tints."[9] Whether Williams saw the defendant drive away in his car after the shooting had occurred is an entirely different question from whether she saw the defendant at the scene at the time of the shooting.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] The defendant's white 1997 Toyota Camry had tinted windows.