******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GEORGE FIGUEROA *v.* COMMISSIONER
OF CORRECTION
(AC 42140)

Alvord, Prescott and DiPentima, Js.

*Syllabus*

The petitioner, who previously had been convicted of the crimes of murder
and carrying a pistol without a permit in connection with the shooting
death of the victim, sought a writ of habeas corpus, claiming, inter alia,
that his trial counsel, D, rendered ineffective assistance by failing to
request an alibi instruction. He claimed that his appellate counsel, C,
rendered ineffective assistance by failing to raise a claim on direct
appeal that his sixth amendment right to a trial by jury was violated by
the trial court's handling of a jury note inquiring about the testimony
of a witness, T, that invaded the fact-finding province of the jury. The
habeas court rendered judgment denying in part and dismissing in part
the habeas petition, from which the petitioner, on the granting of certifi-
cation, appealed to this court. *Held*:

1. The habeas court properly determined that the petitioner was not preju-
   diced by any alleged ineffective assistance of D as the petitioner failed
   to establish that there was a reasonable probability that, but for D's
   failure to request an alibi instruction, the outcome of the petitioner's
   criminal trial would have been different; the petitioner's alibi defense
   was weak, as the petitioner testified vaguely that he believed he was
   in New York City on the day of the murder, his only alibi witness did
   not testify as to his whereabouts on the day of the murder but only
   testified that he had moved to New York City a couple of months prior
   to the murder, there was substantial evidence linking the petitioner to
   the murder of the victim, including the testimony of two eyewitnesses
   who observed the petitioner shoot the victim, testimony which the jury
   clearly credited over the testimony of the petitioner, and there was
   evidence that the victim and the petitioner had engaged in a previous
   altercation in which the petitioner shot at the victim two years earlier.

2. The habeas court properly determined that the petitioner was not preju-
   diced by C's failure to raise a sixth amendment claim on direct appeal;
   the trial court did not impermissibly find facts in violation of the petition-
   er's sixth amendment right to a jury trial, as that court's reference to
   certain relevant pages of the transcript of T's tape-recorded statement
   to the police, in response to the jury's question during deliberations,
   was not improper marshaling of the evidence, as the statement was in
   evidence, the court did not specifically read portions of the statement
   to the jury but only highlighted pages it believed were material to the
   jury's request, it allowed the jury to review the statement itself and
   reminded the jurors that the weight accorded to the evidence was up
   to them.

3. The habeas court properly dismissed the petitioner's freestanding claim
   that the trial court violated his state and federal constitutional rights
   to a jury trial on the ground of procedural default; on direct appeal, the
   petitioner failed to argue that the court, in its handling of the jury note,
   impermissibly found facts in violation of his right to a jury trial, and he
   failed to meet his burden of proving that his procedural default should
   be excused; the petitioner failed to prove that he was prejudiced by
   the trial court's handling of the jury note, and, thus, the petitioner's
   constitutional right to a trial by jury was not violated.

Argued September 16, 2020—officially released January 5, 2021

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district
of Tolland and tried to the court, *Kwak, J.*; judgment
denying in part and dismissing in part the petition, from
which the petitioner, on the granting of certification,

appealed to this court. *Affirmed.*

*Michael W. Brown*, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Rebecca A. Barry*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, J. The petitioner, George Figueroa, appeals from the judgment of the habeas court denying in part and dismissing in part his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court erred by concluding that (1) he failed to sustain his burden of establishing prejudice caused by his trial counsel's failure to request an alibi instruction, (2) he failed to sustain his burden of establishing prejudice caused by his appellate counsel's failure to argue on direct appeal that his constitutional right to a trial by jury was violated, and (3) his claim that his constitutional right to a trial by jury was violated was procedurally defaulted. We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of the petitioner's claims. The petitioner was charged with murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The matter proceeded to trial, and the jury returned a verdict of guilty on both counts. The trial court, *Hartmere, J.*, accepted the verdict and imposed a total effective sentence of sixty years imprisonment. The petitioner thereafter appealed from the judgment of conviction

On appeal, we affirmed the petitioner's conviction. See *State* v. *Figueroa*, 74 Conn. App. 165, 810 A.2d 319 (2002), cert. denied, 262 Conn. 947, 815 A.2d 677 (2003). The following facts, which the jury reasonably could have found, were set forth in our opinion in that appeal. In the summer of 1995, the petitioner and the victim, John Corbett, were involved in a physical altercation on Lilac Street in New Haven. Id., 166. During that altercation, the victim hit the petitioner in the face. Thereafter, the petitioner retreated to his residence on Lilac Street, retrieved his gun, and, from a window of his third floor apartment, began firing at the victim. Id., 166–67. The victim was not injured during this incident, which was never reported to the police. Id., 167.

Shortly thereafter, the victim was incarcerated until sometime in November, 1997. Id. Approximately two weeks after his release, on the afternoon of December 7, 1997, the victim was standing at the corner of Lilac and Newhall Streets, speaking with Edward Wells. Id. The two men were standing in front of 44-46 Lilac Street when the petitioner approached, driving his white 1997 Toyota Camry, which he parked in front of a red sports car that also was parked along the side of Lilac Street. Id. The petitioner got out of his car and entered 40-42 Lilac Street. Id.

In the meantime, Ebonie Moore approached, driving her black car, which she parked along Lilac Street behind the red sports car. Id. She and her passenger, Takheema Williams, who had dated the petitioner, were

sitting in Moore's car listening to music. Id.

The petitioner then emerged from the 40-42 Lilac Street residence and stood near his car. Id. The victim told Wells that he wanted to speak with the petitioner, and he walked over to where the petitioner was standing. Id. "The two talked for a short time, they shook hands, and then a shot was fired. As [the victim] turned away from the [petitioner], he fell face down onto the sidewalk. Wells and Moore then watched as the [petitioner] stood over [the victim], with his arm fully extended and a pistol in his hand, and fired several additional shots into [the victim's] body. The [petitioner] then walked to his white Toyota Camry, which was parked a few feet away, got into the driver's seat and sped along Lilac Street toward Newhall Street." Id., 167–68.

Wells ran to Moore's parked car, banged on the window, and yelled for Moore to call for an ambulance because " '[the petitioner] had just shot [the victim].' " Id., 168. Moore and Wells administered cardiopulmonary resuscitation (CPR) to the victim until the police arrived. Id. "Shortly thereafter, an ambulance arrived and transported [the victim] to Yale-New Haven Hospital where he was pronounced dead about eight minutes after his arrival. [The victim] suffered six gunshot wounds. He was shot once in the stomach, four times in the lower back and once in the back of his left shoulder. Either or both of two of the wounds to [the victim's] lower back were fatal." Id.

"Soon thereafter, Wells and Moore arrived at the hospital where they told a New Haven police detective that it was the [petitioner] who had shot [the victim]. Within the next few days, both Wells and Moore gave statements to the police implicating the [petitioner] as the shooter and selected the [petitioner's] photograph from a photographic array, identifying him as the man who shot [the victim]. On December 10, 1997, Williams gave the police a tape-recorded statement regarding the December 7, 1997 shooting on Lilac Street." Id. Thereafter, the matter proceeded to trial, and the petitioner was convicted.

Following his direct appeal, the petitioner filed a pro se petition for a writ of habeas corpus on August 14, 2006. The habeas court, *Swords, J.*, granted the motion to dismiss filed by the respondent, the Commissioner of Correction, and this court affirmed the habeas court's judgment and dismissed the petitioner's appeal. See *Figueroa* v. *Commissioner of Correction*, 123 Conn. App. 862, 871, 3 A.3d 202 (2010), cert. denied, 299 Conn. 926, 12 A.3d 570 (2011). Thereafter, the petitioner filed a second petition for a writ of habeas corpus, which is the subject of this appeal. In the operative petition dated August 14, 2017, the petitioner alleged ineffective assistance of trial and appellate counsel. He also alleged that his constitutional rights to a trial by jury and due

process of law had been violated. The habeas court, *Kwak, J.,* denied in part and dismissed in part the petition. The court determined that the petitioner had failed to prove that he was prejudiced by any of the alleged errors. The petitioner filed a petition for certification to appeal, which the court granted. Additional facts will be set forth as necessary.

I

The petitioner claims that the habeas court erred in concluding that he was not prejudiced by his trial counsel's failure to request an alibi instruction. Specifically, the petitioner argues that there is a reasonable probability that the outcome of his trial would have been different if the jury had been instructed as to how it should assess the alibi evidence presented at his trial. The petitioner contends that the jury, without proper guidance, could have believed that he had the burden of proving his alibi. In response, the respondent argues that an alibi instruction would not have led the jurors to question the credibility of Wells and Moore due to the strong evidence of the petitioner's identity as the shooter and the weakness of the petitioner's alibi evidence. Moreover, the respondent contends that the petitioner was not prejudiced because the jurors had the capacity to assess alibi evidence adequately without the aid of a specific alibi instruction by relying on their common knowledge. We agree with the respondent that the court properly concluded that the petitioner was not prejudiced by any alleged ineffectiveness of his trial counsel.

The following additional facts and procedural history are relevant. At trial, both Wells and Moore testified that they saw the petitioner shoot the victim. Wells testified that he heard a shot, saw the victim fall to the ground, and then watched as the petitioner stood over the victim and continued to fire at him. He further stated that he had a good look at the petitioner, it was not dark out, he had an unobstructed view, and there was no question in his mind that the petitioner was the individual firing at the victim. Wells also testified that, after the petitioner drove off in his car, Wells banged on the window of Moore's car and asked her to call an ambulance because the petitioner had just shot the victim. Wells told the police officers at the scene that the petitioner had shot the victim, and repeated this to the detectives who took his statement at the police station later that evening. While at the station, the police showed Wells approximately six or seven photographs, and asked him to identify the petitioner. Wells identified the petitioner from the photographs.

Following Wells' testimony, Moore testified that she also saw the petitioner shoot the victim. Specifically, she testified that she saw the petitioner talking with the victim, saw the victim turn away and begin to walk toward her car, and then watched as the petitioner

began to fire at the victim. Moore testified that the victim fell over and the petitioner stood over him and continued to fire. After he stopped firing at the victim, the petitioner got into his car and drove off. Moore testified that Wells then came up to her car and yelled that "[the petitioner] just shot [the victim]." Moore and Wells performed CPR on the victim. Moore went to Yale-New Haven Hospital with Wells and another friend, and later told a detective there that the petitioner "did the shooting." The following day, Moore went to the police station, and iterated that the petitioner had shot the victim. While there, the police showed Moore a photographic array from which she was able to identify the petitioner as the shooter.

The petitioner testified during his criminal trial. On direct examination, he stated that he was not in New Haven on December 7, 1997, the day of the murder. Although the petitioner testified that he could not remember exactly where he was, he believed that he was in New York City watching a football game with friends. During cross-examination, the petitioner repeated that he was in New York City on the day of the murder watching a football game, specifically in Yonkers at the house of a friend, Clifton McQueen. He further stated that there were around eight to ten people at McQueen's house, and that he did not remember any of their names.

In support of the petitioner's contention that he was not in New Haven on the date of the shooting, the defense also called Tanya Fleming, the mother of one of the petitioner's daughters, as a witness. Fleming testified that the petitioner stayed with her in New Haven until September, 1997, and that, sometime during that month, he left to go to New York City. She further testified that the petitioner left his white Toyota Camry with her when he went to New York. She also testified that when she went to Maryland for Thanksgiving for approximately two weeks, she left the Camry at her apartment. When she returned home, however, the Camry was gone. Fleming did not report the car as stolen because she had not made any payments on it, and assumed that it had been repossessed.[1] The police later found the white Toyota Camry abandoned in Orange at a rest area along the Merritt Parkway.

Prior to closing arguments, the court discussed the final version of the jury charge with the prosecutor and defense counsel, Chris DeMarco. DeMarco confirmed with the court that he was not requesting an alibi instruction because he did not believe there was an alibi. On the basis of defense counsel's representations, the court stated that it would not give the jury an alibi instruction. During closing argument, DeMarco noted that the petitioner was not sure where he was on the day of the murder, and that he was unable to have any alibi witness testify for this reason. DeMarco repeated

this theme later on, stating that he was unable to call McQueen to testify as an alibi witness because the petitioner was unsure as to his own whereabouts on the day of the shooting.

During the petitioner's habeas trial, DeMarco testified about his decision not to request an alibi instruction. DeMarco testified that he had not sought an alibi instruction because the petitioner's alibi claim "[was not] solid." Specifically, although he believed that the jury could have credited the petitioner's testimony that he did not know exactly where he was on the day of the murder, DeMarco did not think that the petitioner was entitled to an alibi instruction because, legally, he could not be an alibi witness for himself. He also testified that he did not believe that Fleming's testimony was strong enough to support an alibi claim because any person could leave Connecticut and travel to and from a neighboring state in a few hours.

The petitioner then called Attorney Michael Fitzpatrick to testify as an expert witness regarding trial and appellate advocacy. Fitzpatrick opined that DeMarco should have requested an alibi instruction. He testified that, in his opinion, this failure prejudiced the petitioner because it deprived him of a "recognized defense and a basis for acquittal." Fitzpatrick stated that, although technically speaking the petitioner could not be an alibi witness for himself, he believed that Fleming's testimony "put things over the top and entitled him to an alibi instruction." Finally, he testified that without an alibi instruction, the jury would not have received clear guidance on who had the burden of proving or disproving an alibi defense, as they "may very well believe that the party that's offered the evidence has the burden to prove it."

Following trial, the habeas court concluded that the petitioner had failed to sustain his burden of establishing prejudice with respect to his ineffective assistance of trial counsel claim. Specifically, the habeas court found that "[i]n the underlying criminal case, the evidence linking the petitioner to the crime was substantial, including testimony by multiple eyewitnesses who identified the petitioner as the shooter. Based on the record, the court finds that there does not exist a reasonable likelihood that the outcome of the petitioner's trial would have been different if an alibi instruction had been given." Thereafter, the habeas court denied the petitioner's claim.

We are guided by the following relevant legal principles. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Buie* v. *Commissioner of Correction,*

187 Conn. App. 414, 417, 202 A.3d 453, cert. denied, 331 Conn. 905, 202 A.3d 373 (2019).

"A claim of ineffective assistance of counsel as enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . Our Supreme Court has stated that the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances, and that [j]udicial scrutiny of counsel's performance must be highly deferential. . . .

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different. . . . In making this determination, a court hearing an ineffectiveness claim . . . must consider the totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . .

"A petitioner's claim will succeed only if both prongs are satisfied. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unworkable. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong, whichever is easier." (Internal quotation marks omitted.) *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 530–31, 208 A.3d 296, cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019).

On the basis of our review of the record, we conclude that the petitioner has failed to establish that there was a reasonable probability that, but for DeMarco's failure to request an alibi instruction, the outcome of his trial would have been different. In the present case, there was substantial evidence linking the petitioner to the

victim's murder. Specifically, two eyewitnesses testified to observing, at close range, the petitioner shoot the victim. Wells testified that he was about a "house away" from the petitioner when he heard a shot and saw the victim fall to the ground. Wells then watched as the petitioner stood over the victim and shot him approximately seven times. Wells further testified that he had an unobstructed and good view of the petitioner, and that it was light out. Upon witnessing the event, Wells immediately banged on the window of Moore's car, told her that the petitioner had just shot the victim, and asked her to call an ambulance. He told the police both at the scene and later that evening at the police station that the petitioner was the victim's shooter, and he identified the petitioner from a photographic array. Wells' testimony thus provided strong evidence of the petitioner's guilt.

Moore independently corroborated Wells' identification of the petitioner. Moore testified that she witnessed the incident at close range, from approximately two car lengths away.[2] Even though a tree and a red car were partially obstructing her view, Moore testified that she saw the petitioner speaking with the victim, saw them shake hands following their conversation, saw the victim turn away, and then watched as the petitioner began firing at the victim. Although Moore did not see the gun, she could tell that the petitioner was firing at the victim because she felt a vibration and saw "fire come out" from the petitioner's arm. Moore then testified that the petitioner stood over the victim and shot him approximately seven times. Following the shooting, Moore stated that Wells ran up to her car, banged on her window, and shouted that "[the petitioner] just shot [the victim]." Moore traveled to the hospital with Wells and a friend and, while there, she told a detective that "[the petitioner] did the shooting." The next day, Moore went to the police station, where she iterated that the petitioner had shot the victim, and identified him from a photograph array. Moore's testimony, therefore, also provided strong evidence of the petitioner's identity as the shooter.

In addition to the eyewitness testimony, the state presented circumstantial evidence against the petitioner during his trial on the issues of intent and motive, further establishing the likelihood that he was the shooter.[3] "Evidence of prior threats by a defendant directed to his victim has been held relevant to the issues of intent and motive." (Internal quotation marks omitted.) *State* v. *Fisher*, 57 Conn. App. 371, 376, 748 A.2d 377, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000). Here, during the petitioner's criminal trial, Moore testified that, in the summer of 1995, the petitioner and the victim had been involved in an altercation. During that summer, the victim and the petitioner had gotten into a physical fight, and the victim "beat the [petitioner] up." This angered the petitioner, who

went into his house and began shooting out the window at the victim. The victim was not shot during this incident, which was never reported to the police. Moore's testimony demonstrated that the petitioner had threatened the victim previously, and provided circumstantial evidence that the petitioner intended to shoot the victim, and had a motive for doing so. Such evidence, therefore, provided additional support for the state's case against the petitioner. On the record presented, we thus are not persuaded that there is a reasonable probability that the outcome of the petitioner's trial would have been different had his defense counsel requested an alibi instruction given the strength of the state's case.

Moreover, the very nature of an alibi and the detailed instructions that the court gave the jury on the burden of proof and witness credibility undermine the petitioner's argument that he was prejudiced by the lack of an alibi instruction. An alibi "is a claim by the defendant that he or she was in a place different from the scene of the crime at the time of the alleged offense." *State* v. *Tutson*, 278 Conn. 715, 733, 899 A.2d 598 (2006). "A defendant asserting an alibi and relying upon it as a defense is entitled to have the jury charged that the evidence offered by him on that subject is to be considered by them in connection with all the rest of the evidence in ascertaining whether he was present, and that if a reasonable doubt on that point exists, it is the jury's duty to acquit him." *State* v. *Butler*, 207 Conn. 619, 631, 543 A.2d 270 (1988). However, a "trial court has no duty to instruct upon alibi in the absence of a request, and . . . the failure to instruct in such an instance will not ordinarily constitute reversible error, even though substantial alibi evidence may have been introduced by the defense." (Internal quotation marks omitted.) Id. "While an alibi is commonly called a defense, strictly speaking it is merely rebuttal of the state's evidence." (Internal quotation marks omitted.) *State* v. *Parham*, 174 Conn. 500, 510, 391 A.2d 148 (1978). Accordingly, "an unrequested instruction is not necessary inasmuch as it is within the common knowledge of jurors, without being told, that if the accused was at a place other than the scene of the commission of a crime requiring personal presence, he cannot be guilty." (Internal quotation marks omitted.) Id.

Here, although the court did not deliver an alibi instruction to the jury, it repeatedly emphasized that the state had the burden of proof throughout its instructions. The court initially told the jury that "the burden to prove the [petitioner] guilty of the crime with which he is charged is upon the state. The [petitioner] does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged." The court later instructed the jury that the "state must prove beyond a reasonable doubt that the

[petitioner] caused the death of [the victim] with the intent to cause the death. The state must prove beyond a reasonable doubt that the [petitioner] caused the death of [the victim] by the use of a firearm."

The court also provided the jury with thorough instructions on witness credibility. Specifically, the court instructed the jury that it "must decide which testimony to believe and which testimony not to believe. You may believe all, none or any part of any witness' testimony, that is up to you. In making that decision you may take into account a number of factors including the following: (1) Was the witness able to see or hear or know the things about which that witness testified? (2) How well was the witness able to recall or describe those things? (3) What was the witness' manner while testifying? (4) Did the witness have an interest in the outcome of this case, or any bias or prejudice concerning any party or any matter involved in the case? (5) How reasonable was the witness' testimony considered in the light of all the evidence in the case? And (6) was the witness' testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses or by other evidence?" The petitioner did not object to the burden of proof and witness credibility portions of the court's charge to the jury.

Because the state had the burden of proving that the petitioner caused the death of the victim by use of a firearm, to find the petitioner guilty, the jury necessarily needed to find that the state had proven beyond a reasonable doubt that the petitioner was present at the scene of the crime and had, in fact, shot and killed the victim. Although the jurors did not receive a specific instruction from the court regarding a claim of alibi, it was within their common knowledge "without being told, that if the accused was at a place other than the scene of the commission of a crime requiring personal presence, he cannot be guilty." (Internal quotation marks omitted.) *State* v. *Parham*, supra, 174 Conn. 510. By finding the petitioner guilty, the jury clearly weighed the credibility of the witnesses' testimony, in accordance with the court's instructions, and rejected the petitioner's testimony that he had been in New York City during the time of the murder, and instead credited the testimony of both Wells and Moore that they saw the petitioner shoot the victim. See *State* v. *Perez*, 147 Conn. App. 53, 111, 80 A.3d 103 (2013) (acknowledging that "[i]t is a fundamental principle that jurors are presumed to follow the instructions given by the judge" (internal quotation marks omitted)), aff'd, 322 Conn. 118, 139 A.3d 654 (2016). The jury's apparent rejection of the petitioner's alibi indicates that it did not find his testimony credible. Moreover, in light of the court's instructions that placed the burden of proof squarely on the state, the jury would not have been misled by the absence of any discussion in the charge of the peti-

tioner's alibi claim. See *State* v. *Parham*, supra, 510 (concluding absence of alibi instruction could not have misled jury when it was clear jury was instructed that it could not find defendant guilty unless he was at scene of burglary and defendant failed to claim error in charge regarding burden and quantum of proof required for conviction). Consequently, receiving an alibi instruction likely would not have caused the outcome of the petitioner's trial to be different.

The weakness of the petitioner's alibi evidence presented at trial further indicates that the petitioner was not prejudiced by DeMarco's failure to request an alibi instruction. During trial, the petitioner testified vaguely that he was not in New Haven on the day of the murder, and that he "believed" he was in New York City watching a football game with friends. Although he later stated during cross-examination that he was at the house of his friend Clifton McQueen, neither McQueen, nor any of the approximately eight to ten people whom the petitioner said were with him but whom he could not name, testified in order to corroborate his alibi.

The petitioner's only alibi witness was Tanya Fleming, and her testimony did not strengthen the alibi claim. Although she testified that the petitioner left Connecticut to move to New York City sometime in September, 1997, she did not testify as to the petitioner's whereabouts on December 7, 1997, the day of the murder. Even assuming that the petitioner had moved to New York City in September, 1997, Fleming's testimony did not foreclose the possibility that the petitioner returned to Connecticut on December 7, 1997, murdered the victim, and then returned to New York City. Indeed, as DeMarco testified during the petitioner's habeas trial, Fleming's testimony did not strongly corroborate the petitioner's alibi because any person can leave Connecticut and travel to and from a neighboring state in a few hours. Due to Fleming's inability to specify where the petitioner was on the day of the murder, the jury faced a credibility determination between the petitioner's claim that he was in New York City, and the testimony of Wells and Moore that they witnessed the petitioner shoot the victim. By returning a guilty verdict, the jury appears to have credited the testimony of Wells and Moore rather than that of the petitioner. The petitioner, therefore, has not met his burden of demonstrating that there is a reasonable probability that, but for DeMarco's failure to request an alibi instruction, the outcome of his trial would have been different.[4]

On the basis of the record, we conclude that the habeas court properly determined that, due to the substantial evidence linking the petitioner to the crime, the petitioner cannot establish prejudice as a result of any allegedly deficient performance by his trial counsel. Accordingly, his claim of ineffective assistance of trial counsel fails.

## II

The petitioner next claims that the habeas court erred by concluding that he was not prejudiced by his appellate counsel's failure to raise as a claim on direct appeal that the trial court's handling of a jury note inquiring about Takheema Williams' testimony violated his sixth amendment right to a trial by jury. Specifically, the petitioner argues that a claim that the trial court violated his sixth amendment rights by invading the fact-finding province of the jury is more "favorable" to a criminal defendant than the claim raised by his appellate counsel, and that the habeas court erred by failing to consider this when determining that the petitioner was not prejudiced. In response, the respondent contends that the petitioner was not prejudiced by his appellate counsel's failure to raise a sixth amendment claim because any alleged court fact-finding was limited to a single eyewitness, and, due to the strength of Wells' and Moore's testimony, Williams' identification testimony was of marginal significance. We agree with the respondent that the petitioner was not prejudiced by his appellate counsel's failure to raise a sixth amendment claim.

The following additional facts and procedural history are relevant to this claim. At trial, the state called Williams to testify about the events on the day of the murder. Williams testified that she was with Moore on Lilac Street on December 7, 1997. Williams and Moore went to the flea market, and then returned to Lilac Street in Moore's black car. When the two of them returned, Moore once again parked her car on Lilac Street. The state then attempted to ask Williams questions about the events that transpired after she and Moore returned to Lilac Street, but Williams testified that she was unable to remember most of the day's events. As a result, her taped statement from December 10, 1997, and a twenty-one page transcript of that tape were admitted into evidence as full exhibits for substantive and impeachment purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[5]

On April 27, 2000, during the fifth day of jury deliberations, the jury submitted the following question to the court: "We'd like to hear if [Takheema] Williams was ever asked to answer the question 'Did you see [the petitioner] at the scene?' " After reviewing Williams' testimony, and outside the presence of the jury, the court stated to counsel that "[t]he literal answer [to the question] is no, she was never asked that question. . . . I think, in terms of the live testimony, the answer is 'no.' She was never asked that question." The court further stated, however, that Williams' *Whelan* statement had been admitted for substantive and impeachment purposes, and that on pages eighteen[6] and twenty[7] of the transcript of that statement, she did testify as to what she saw. The court indicated that it intended to

inform the jurors that there were two parts to their question, the first being whether there was live testimony to that effect and the second being whether there was other evidence to that effect. DeMarco objected on the ground that any reference to the relevant pages of Williams' *Whelan* statement would constitute an improper marshaling of the evidence. He requested that the court refrain from making any specific reference to page numbers. The court noted the objection, but stated that it intended to reference the page numbers in order to "shortcut" it for the jury.

Thereafter, the jury was brought back into the courtroom. The court instructed the jury that Williams was never asked whether she saw the petitioner at the scene during her in-court testimony. The court also told the jurors, however, that it "want[ed] to remind you that as to the witness [Takheema] Williams, her prior tape recorded statement was introduced. . . . You have that. The transcript is state's exhibit 97, which you also have, and I'll refer you to my instructions on the use of that statement, which [is] on page eighteen of my instructions as to the use you may make of it. I'll also refer you to, in the transcript, and if you listen to the tape-recorded statement, pages eighteen and twenty, of her statement, but again, it's up to you as to what weight you accord to any evidence. I just wanted to remind you of that. So, I think the answer to your question is in two parts, then, as I've described." Four days later, on May 1, 2000, the jury returned a verdict of guilty of both counts.

On direct appeal, the petitioner claimed that "the trial court improperly directed the jury to two pages of a witness' twenty-one page statement in response to a question by the jury during its deliberations." *State* v. *Figueroa*, supra, 74 Conn. App. 165. He argued that the court's response to the jury's inquiry was improper and violated his right to a fair trial because "(1) the court had authority to refer the jury to Williams' in-court testimony only and lacked authority to direct the jury to Williams' *Whelan* statement, and (2) referring to only two pages of the twenty-one page *Whelan* statement constituted an improper marshaling of the evidence by the court in favor of the state."[8] Id., 171. The petitioner made this claim pursuant to the due process clause of the fourteenth amendment. This court rejected the petitioner's claims, holding that "[t]he court's reference to particular pages of the *Whelan* statement in an effort to answer the jury's inquiry did not constitute a marshaling of evidence in favor of the state but, instead, a simple response to the jury's request for a review of a portion of the record under Practice Book § 42-26." Id., 176. We also concluded that "the court acted in furtherance of the interests of justice by referring the jury to Williams' *Whelan* statement because, if it had not done so, the court would not have been completely responsive to the jury's request. In addition, we fail to

see how the court violated the defendant's constitutional right to a fair trial by referring the jury to Williams' *Whelan* statement because it already had been admitted for substantive purposes and was in the jury's possession during its deliberations. Accordingly, the defendant cannot prevail on his claim because he has failed to demonstrate that the alleged constitutional violation . . . exists and . . . deprived [him] of a fair trial . . . ." (Internal quotation marks omitted.) Id., 174–75.

During the petitioner's habeas trial, his appellate counsel, Richard Condon, testified that, on direct appeal, he had argued that the defendant was denied his right to a fair trial only in violation of the fourteenth amendment's due process clause. He testified that he did not raise a sixth amendment claim on appeal because the arguments involved with such a claim would have been similar to and duplicative of the claims he brought under the fourteenth amendment. Later that day, Fitzpatrick testified that he was of the opinion that it was objectively unreasonable for Condon not to have raised a sixth amendment claim. Fitzpatrick testified that a sixth amendment claim is stronger than a fourteenth amendment claim because the standard of review for a sixth amendment claim is not the more deferential abuse of discretion standard, and, under the sixth amendment, "any intrusion into the jury's right to decide and decide along the facts is reversible error."[9]

The habeas court held that the "petitioner has failed to sustain his burden of establishing prejudice with respect" to his claim premised on the ineffective assistance of Condon. The habeas court further concluded that "[p]ursuant to the record, the court determines that the petitioner has failed to sustain his burden of proving prejudice by demonstrating a reasonable probability that, but for [Condon's] failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal. The Appellate Court's holding in the petitioner's direct appeal indicates that it is not reasonably likely that the petitioner would prevail on his claim that he was deprived of a fair trial by the trial court's actions in handling the jury note. . . . Therefore, this claim must be denied." Accordingly, the habeas court denied the petitioner's claim.

We are guided by the following relevant legal principles. "To succeed on an ineffective assistance of appellate counsel claim, the petitioner must satisfy both the performance prong and the prejudice prong of *Strickland* . . . ." *Tutson* v. *Commissioner of Correction*, 168 Conn. App. 108, 122, 144 A.3d 519, cert. denied, 323 Conn. 933, 150 A.3d 233 (2016). "The first part of the *Strickland* analysis requires the petitioner to establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . To satisfy the prejudice prong, the petitioner must demonstrate that there is a reason-

able probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed in his direct appeal, i.e., reversal of his conviction or granting of a new trial. . . . Thus, to determine whether a habeas petitioner had a reasonable probability of prevailing on appeal, a reviewing court necessarily analyzes the merits of the underlying claimed error in accordance with the appropriate appellate standard for measuring harm." (Citations omitted; internal quotation marks omitted.) Id., 123.

The sixth amendment to the United States constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const., amend. VI. "The [c]onstitution casts judge and jury in mutually supporting—yet nevertheless distinct—roles. Undeniably inherent in the constitutional guarantee of trial by jury is the principle that a court may not step in and direct a finding of contested fact in favor of the prosecution regardless of how overwhelmingly the evidence may point in that direction. The trial judge is . . . barred from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused." (Internal quotation marks omitted.) *United States* v. *Argentine*, 814 F.2d 783, 788 (1st Cir. 1987). "Although [a court] may, at its discretion, reread testimony where the jury makes a request to have specific testimony reread . . . the culling of testimony in response to a jury's open-ended question may, in effect, make the court a finder of fact . . . ." (Citations omitted; internal quotation marks omitted.) *United States* v. *Rivera-Santiago*, 107 F.3d 960, 965 (1st Cir. 1997). A constitutional error may thus occur where a court's "answer to a jury's factual question had the effect of mandating that the jury reach a conclusion on a particular issue." Id.; see also *C & H Associates Ltd. Partnership* v. *Stratford*, 122 Conn. App. 198, 203, 998 A.2d 833 (2010) ("litigants have a constitutional right to have factual issues resolved by the jury" (internal quotation marks omitted)).

Nevertheless, the court has discretion when determining how to respond to a jury question that arises during deliberation. Practice Book § 42-26 provides that "[i]f the jury after retiring for deliberations requests a review of certain testimony, the jury shall be conducted to the courtroom. Whenever the jury's request is reasonable, the judicial authority, after notice to and consultation with the prosecuting authority and counsel for the defense, shall have the requested parts of the testimony read to the jury." "[T]he trial court has discretion to grant a jury's request to review testimony. . . . What portions of the record, if any, will be submitted to the jury for [its] consideration is a matter of sound judicial discretion. . . . In determining

whether the trial court has abused its discretion, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . [T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Internal quotation marks omitted.) *State* v. *Martinez*, 171 Conn. App. 702, 743–44, 158 A.3d 373, cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017).

As a preliminary matter, we note that the petitioner makes the conclusory statement that his appellate counsel's failure to raise a sixth amendment claim was prejudicial because "if the province of the jury is violated as to a material fact in a criminal proceeding, reversal is virtually automatic." In the petitioner's view, because reversal is automatic when the province of the jury is violated, his appellate counsel rendered ineffective assistance by failing to raise a sixth amendment claim because the analysis of a sixth amendment claim based on court fact-finding is more favorable to a criminal defendant. We have found no authority for the proposition that reversal is automatic if the province of the jury is violated, nor has the petitioner provided us with any authority for his assertion. We, therefore, conclude that this claim is inadequately briefed. See *State* v. *Claudio C.*, 125 Conn. App. 588, 600, 11 A.3d 1086 (2010) ("[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011). Accordingly, we address whether the petitioner was prejudiced by any allegedly ineffective assistance of his appellate counsel on other grounds.

As we concluded on direct appeal, it was within the court's discretion to refer the jury to Williams' *Whelan* statement because the jury's inquiry was not limited to in-court testimony. The jury requested to know whether Williams "was *ever* asked to answer the question, [D]id you see [the petitioner] at the scene?" (Emphasis in original; internal quotations marks omitted.) *State* v. *Figueroa*, supra, 74 Conn. App. 173. Because Williams was never asked that question during her in-court testimony, "the most reliable means for the jury fairly and intelligently to ascertain whether she ever had been asked and had answered that question was for the court to refer the jury to a material part of the evidence, namely, Williams' *Whelan* statement, which already was in the jury's possession." Id. Referring the jury to Williams' *Whelan* statement, therefore, was a matter entirely within the court's discretion, and the court did not abuse its discretion in doing so. Id., 173–74.

We also refer to our conclusion on direct appeal that

the court did not unfairly and prejudicially marshal the evidence in favor of the state when it referred to two particular pages of Williams' *Whelan* statement. As we noted previously, the court did not marshal the evidence in favor of the state, and its response to the jury's question was, instead, "a simple response to the jury's request for a review of a portion of the record under Practice Book § 42-26." Id., 176. Because the court has discretion to determine what portions of the record, if any, should be submitted to the jury for its review, it was "in the court's discretion to determine that those particular pages, and not the entire twenty-one page statement, were responsive to the jury's request." Id., 177.

We now turn to the issue of whether the petitioner was prejudiced by his appellate counsel's failure to argue that the court violated the petitioner's sixth amendment right to a jury trial by referring the jury to two pages of Williams' *Whelan* statement. We conclude that the petitioner was not prejudiced because the court did not violate the petitioner's sixth amendment rights by impermissibly finding facts. Although the court referred the jury to two specific pages of Williams' *Whelan* statement, the manner in which the court handled this referral did not constitute fact-finding. First, the court never affirmatively stated that Williams had been asked and answered the question of whether she had seen the petitioner at the scene. Instead, the court informed the jury that it wanted "to remind you that as to the witness Takheema Williams, her prior tape-recorded statement was introduced. . . . I'll also refer you to, in the transcript, and if you listen to the tape-recorded statement, pages eighteen and twenty, of her statement . . . ." The court, therefore, left it to the jury to review Williams' statement to determine if she had indeed stated that she had witnessed the petitioner at the scene.[10]

Second, the court did not selectively read only portions of Williams' *Whelan* statement to the jury when answering its question. Although the court highlighted the two pages of her statement that the court believed were material to the jury's request, the court did not read any of her statement to the jury and, again, left it to the jury to review the statement itself. It also never represented to the jury that it should review only this portion of her statement. It, thus, cannot be said that the court's referral to Williams' *Whelan* statement culled her statement and, in effect, made the court a finder of fact. See *United States* v. *Rivera-Santiago*, supra, 107 F.3d 965.

Third, the court's instructions about the use of Williams' statement indicates that the court did not override or interfere with the jurors' independent judgment. Specifically, the court instructed the jurors that "it's up to you as to what weight you accord to any evidence."

The court also referred the jury to its prior instructions on the use of Williams' statement, in which it had instructed the jury that it could use her statement for both substantive and impeachment purposes. The court's instructions thus reinforced to the jury that it was not required to find that Williams had ever stated that the petitioner was at the scene and, even if it did find she had made that statement, it was up to the jury to determine what weight to give the statement.

Consequently, we conclude that the court left the consideration of Williams' statement completely to the jury's discretion, and did not, in effect, mandate that the jury reach a particular conclusion on the issue of whether Williams ever stated that she had seen the petitioner at the scene. See *United States* v. *Rivera-Santiago*, supra, 107 F.3d 965. The court, therefore, did not impermissibly find facts in violation of the petitioner's sixth amendment right to a jury trial.

We are unpersuaded by the petitioner's argument to the contrary. The petitioner mainly relies on federal cases in arguing that the court's handling of the jury note violated his sixth amendment right to a jury trial. These cases, however, are distinguishable. The cases he relies on are direct appeals from a judgment of conviction rendered following a jury trial. None of the cases involves a claim made during a habeas proceeding that the appellant was denied effective assistance of appellate counsel. Moreover, the cases are factually distinguishable from the present case. In the cases that the petitioner cites, the court reversed the appellant's conviction because the trial court impermissibly found facts by: (1) selectively reading portions of the germane testimony and affirmatively representing to the jury that the testimony it read would provide " 'the' " answer to the jury's question; id., 966; (2) presenting a witness' testimony as an accomplished fact derived from a collaborative checking of the record; *United States* v. *Argentine*, supra, 814 F.2d 787; (3) improperly permitting the attorneys to deliver supplemental arguments on a jury's question when a one word answer would have provided a direct and complete response; *United States* v. *Ayeni*, 374 F.3d 1313, 1316 (D.C. Cir. 2004); and (4) endorsing the jury's preliminary interpretation of an indictment and directing the jury to evidence that the jury had not inquired about in its note. *United States* v. *Miller*, 738 F.3d 361, 383–84 (D.C. Cir. 2013).

In the present case, the court's handling of the jury note did not implicate any of these concerns. As previously observed, the court here never affirmatively represented that Williams had ever answered the question of whether she had seen the petitioner at the scene. Instead, the court simply directed the jury to the relevant portions of her testimony that were material to the jury's inquiry and reminded the jurors that the weight accorded to that evidence was up to them. See *State*

v. *Ruffin*, 144 Conn. App. 387, 406–407, 71 A.3d 695 (2013) (concluding that there was no error in court's instructions when court instructed jury on nature of inconsistent evidence and jury's role in determining witness credibility to aid jury in assessing credibility of and weighing witness' prior statements), aff'd, 316 Conn. 20, 110 A.3d 1225 (2015); *State* v. *Figueroa*, supra, 74 Conn. App. 173 (concluding that court did not abuse its discretion when most reliable means for jury to ascertain answer to its question was to refer jury to material part of evidence already in jury's possession). The cases that the petitioner relies on, therefore, are distinguishable.

We conclude that the habeas court properly determined that the petitioner failed to meet his burden of proving the prejudice prong of *Strickland*. In the present case, the court did not impermissibly find facts in violation of the petitioner's sixth amendment right to a jury trial. Because there was no sixth amendment violation, the petitioner has failed to meet his burden of proving that there is a reasonable probability that, but for appellate counsel's failure to raise the sixth amendment issue on appeal, he would have prevailed on direct appeal. Accordingly, his claim of ineffective assistance of appellate counsel fails.

### III

Finally, the petitioner claims that the habeas court erred by dismissing his claim that the trial court's handling of the jury note violated his federal and state constitutional rights to jury fact-finding. This freestanding claim, which the habeas court dismissed on the ground of procedural default, was not tethered to any ineffective assistance of counsel claim. The petitioner argues that the habeas court incorrectly concluded that this claim was procedurally defaulted or, alternatively, that he failed to prove cause and prejudice necessary to overcome the default. In response, the respondent contends that the habeas court correctly concluded that this claim was procedurally defaulted. We agree with the respondent that the petitioner's claim was procedurally defaulted and that the petitioner failed to show that he was prejudiced by the improprieties he claims in his petition.

The following additional facts and procedural history are relevant. In his operative petition for a writ of habeas corpus, the petitioner alleged that his constitutional right to a trial by jury was violated. Specifically, the petitioner alleged that his right to a trial by jury is protected by the sixth amendment to the United States constitution, and article first, § 19, of the Connecticut constitution.[11] He further alleged that the trial court invaded the province of the jury by improperly responding to the jury note, and that this violation of his right to a trial by jury was a structural error that is not subject to the harmless error analysis. The petition-

er's freestanding claim that his constitutional right to a trial by jury was violated was not raised either at the petitioner's criminal trial or in his direct appeal.

The respondent sought dismissal of this claim on procedural default grounds. The habeas court agreed with the respondent and concluded that the petitioner's claim was procedurally defaulted. The habeas court held that "the petitioner has failed to allege a legally cognizable cause and prejudice to rebut his procedural default, and he is thus barred from having the claim raised in his petition decided on the merits in the habeas corpus forum."[12] Accordingly, the habeas court dismissed the petitioner's claim.

"A party in a habeas appeal procedurally defaults on a claim when he raises issues on appeal that were not properly raised at the criminal trial or the appeal thereafter. . . . Habeas, as a collateral form of relief, is generally available to litigate constitutional issues only if a more direct route to justice has been foreclosed through no fault of the petitioner. . . . The reviewability of habeas claims not properly pursued on appeal is subject to the cause and prejudice standard." (Citation omitted; internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 511, 193 A.3d 625 (2018). "[A] petitioner must demonstrate good cause for his failure to raise a claim . . . on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . [T]he cause and prejudice test is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, inadvertence or ignorance . . . . The cause and prejudice requirement is not jurisdictional in nature, but rather a prudential limitation on the right to raise constitutional claims in collateral proceedings." (Citation omitted; internal quotation marks omitted.) Id., 515. "Cause and prejudice must be established conjunctively. . . . If the petitioner fails to demonstrate either one, a trial court will not review the merits of his habeas claim." (Internal quotation marks omitted.) *Mish* v. *Commissioner of Correction*, 133 Conn. App. 845, 850, 37 A.3d 179, cert. denied, 305 Conn. 918, 47 A.3d 390 (2012).

"For a petitioner to demonstrate prejudice, he must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. . . . [T]he petitioner would have to demonstrate that . . . there was a substantial likelihood that the jury would not have found the petitioner guilty of the crime of which he was convicted. . . . This is the same showing of prejudice that is required for *Strickland* . . . errors. . . . A reasonable probability is a probability sufficient to undermine confidence in

the outcome." (Internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 515–16.

In the present case, the habeas court correctly determined that the petitioner's freestanding claim that his federal and state constitutional rights to a trial by jury were violated was procedurally defaulted. On direct appeal, the petitioner failed to argue that the trial court impermissibly found facts in violation of his right to a jury trial under the sixth amendment to the United States constitution and article first, § 19, of the Connecticut constitution. The habeas court, therefore, could only consider the petitioner's procedurally defaulted freestanding claim if the petitioner could demonstrate good cause for his failure to raise it on direct appeal and actual prejudice from this claimed impropriety. *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 515.

The habeas court properly determined that the petitioner failed to meet his burden of proving that his procedural default should be excused. Here, the petitioner failed to prove that he was prejudiced by the trial court's handling of the jury note. As observed in part II of this opinion, the trial court did not impermissibly find facts in its handling of the jury note. The petitioner's constitutional right to a trial by jury, therefore, was not violated. Because there was no violation, the petitioner has failed to demonstrate that there was a substantial likelihood that the jury would not have found him guilty. Due to the conjunctive nature of the cause and prejudice standard, the petitioner's failure to meet his burden of proving prejudice prevented the habeas court from excusing his procedural default. *Mish* v. *Commissioner of Correction*, supra, 133 Conn. App. 850. Accordingly, the habeas court properly dismissed the petitioner's freestanding claim that his federal and state constitutional rights to a jury trial were violated on the ground of procedural default.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Fleming later testified on cross-examination that the petitioner left her his car so that she could get to and from work, and that she had assumed responsibility for making payments on the car. She never registered the car in her name.

[2] Upon returning to Lilac Street, Moore parked her car behind a red car, which was parked right behind the petitioner's white Camry.

[3] Although motive is not an element of the charges against the defendant; see General Statutes §§ 29-35 and 53a-54a; "[e]vidence of motive is a highly relevant factor for assessing the guilt or innocence of a defendant. . . . Motive is a fact which may be inferred from circumstances; hence the circumstances from which it may be inferred are relevant." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Carter*, 84 Conn. App. 263, 278, 853 A.2d 565, cert. denied, 271 Conn. 932, 859 A.2d 931 (2004), cert. denied, 544 U.S. 1066, 125 S. Ct. 2529, 161 L. Ed. 2d 1120 (2005). Any evidence of the petitioner's motive or intent to shoot the victim, therefore, is highly relevant in assessing the strength of the state's case and whether the petitioner was prejudiced by his defense counsel's failure to request an alibi instruction.

[4] The petitioner also argues on appeal that he was prejudiced by statements

that his defense counsel made during closing argument that seemingly undermined the alibi evidence that had been presented during trial. These statements consist of two comments during the entirety of his counsel's closing argument. First, DeMarco argued that he did not present an alibi witness because the petitioner was not sure where he was on the day of the murder. DeMarco attempted to explain the petitioner's lack of certainty about his whereabouts by arguing that the petitioner had no reason to remember that date if he indeed did not murder the victim, as he was arrested in September, 1998, approximately nine months after the murder. Second, DeMarco noted to the jury that he could not call McQueen as an alibi witness because the petitioner was not positive where he was, and thus where McQueen was, on the day of the murder.

Due to this lack of certainty, defense counsel stated that he was not permitted to call McQueen as a witness. In light of the strength of the state's case against the petitioner, the strength of the court's instructions, and the weakness of the petitioner's alibi evidence that we have noted above, we conclude that the petitioner has not met his burden of proving that he was prejudiced by these comments. See *Leon* v. *Commissioner of Correction*, supra, 189 Conn. App. 540 (concluding that petitioner was not deprived of right to effective assistance of counsel despite petitioner's challenge to defense counsel's remarks during closing argument because petitioner failed to meet burden of proving that outcome would have been different where evidence strongly supported jury's verdict).

[5] In *State* v. *Whelan*, supra, 200 Conn. 753, our Supreme Court adopted a rule "allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Pursuant to *Whelan*, a court can admit a witness' prior written inconsistent statement for substantive purposes when the witness claims to have no memory of the subject they are being asked to testify about. See id., 749 n.4 ("inconsistencies may be found . . . in denial of recollection").

[6] Page eighteen of Williams' *Whelan* statement reveals the following colloquy between Williams and Detective Edwin Rodriguez:

"Q. Okay, when was the last time you'd seen [the petitioner]? Two days before the shooting?

"A. Yes.

"Q. And you saw him the day he took off in the car, too.

"A. Uh-huh.''

[7] Page twenty of Williams' *Whelan* statement reveals the following colloquy between Williams and Detective Edwin Rodriguez:

"Q. Getting back to when you were in the vehicle, and you stated to me, [Moore] told you something after everything was done. What did she tell you, again? Can you tell—

"A. You seen that. You know who did it.

"Q. And she meant saying that if you saw the same thing she did?

"A. Yeah.

"Q. And you told her no at the time. Is that correct?

"A. No, I didn't.

"Q. And what did you tell her?

"A. I told her 'yeah.'

"Q. Okay, you told her you—you saw the same thing she saw.

"A. Uh-huh.''

[8] On appeal, the petitioner conceded that his claim that the trial court had acted beyond the scope of its authority when referring the jury to Williams' *Whelan* statement was unpreserved. *State* v. *Figueroa*, supra, 74 Conn. App. 171. Accordingly, we reviewed this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A. 2d 823 (1989).

[9] We note that Fitzpatrick further opined that the petitioner would have prevailed on appeal if the stronger sixth amendment claim had also been raised; we do not address the propriety of that opinion in this appeal. See generally *Hodges* v. *Commissioner of Correction*, 187 Conn. App. 394, 404–405, 202 A.3d 421("expert opinion as to the ultimate issue in a case is admissible only when necessary for the trier of fact to make sense of the proffered evidence, rendering the situation . . . of such a nature as to require an expert to express an opinion on the precise question upon which the court ultimately had to pass" (internal quotation marks omitted)), cert. denied, 331 Conn. 912, 203 A.3d 1246 (2019).

[10] It is clear from the transcript of the colloquies identified in footnotes 6 and 7 of this opinion that Williams was never asked the precise question of whether she had seen the petitioner at the scene. During her statement

to the police, Williams did, however, state that she had seen the petitioner on the day he took off in the car, and that she had confirmed with Moore that she had seen the same thing that Moore had seen and that she knew who shot the victim. See footnotes 6 and 7 of this opinion. Accordingly, the jury could have interpreted the colloquies between Williams and the detective taking her statement as the functional equivalent of being asked whether she had seen the petitioner at the scene and, thus, material to its inquiry. See *State* v. *Figueroa*, supra, 74 Conn. App. 173 (concluding that most reliable means for jury to assess whether Williams had ever been asked and had ever answered question was to refer jury to material part of evidence already in jury's possession).

[11] Article first, § 19, of the Connecticut constitution provides that "[t]he right of trial by jury shall remain inviolate . . . ." Our Supreme Court continually has reaffirmed this principle that "[l]itigants have a constitutional right to have issues of fact determined by the jury." *Douglass* v. *95 Pearl Street Corp.*, 157 Conn. 73, 80–81, 245 A.2d 129 (1968); see also *C & H Associates Ltd. Partnership* v. *Stratford*, supra, 122 Conn. App. 203 (noting same).

[12] The habeas court did not specify in its memorandum of decision whether it was relying on the state or federal right to jury fact-finding when dismissing the petitioner's claim.